## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS<br>  One Ashburton Place, 18th Floor<br>  Boston, MA 02108,<br><br>PEOPLE OF THE STATE OF ILLINOIS<br>  100 W Randolph St., 12th Floor<br>  Chicago, IL 60601,<br><br>    and<br><br>STATE OF NEW YORK<br>  120 Broadway<br>  New York, NY 10271,<br><br>                    Plaintiffs,<br>    v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION,<br>  400 Maryland Avenue, S.W.<br>  Washington, DC 20202,<br><br>    and<br><br>ELISABETH DEVOS, *in her official capacity as Secretary of Education,*<br>  400 Maryland Avenue, S.W.<br>  Washington, DC 20202,<br><br>                Defendants. | **COMPLAINT**<br>**CIVIL ACTION NO: 17-2679** |

## INTRODUCTION

1.      The Commonwealth of Massachusetts, by and through Attorney General Maura Healey (the "Massachusetts AGO"), the People of the State of Illinois, by and through Lisa Madigan, Attorney General of the State of Illinois (the "Illinois AGO"), and the State of New York, by and through Attorney General Eric T. Schneiderman (the "New York AGO"), bring this action against the United States Department of Education (the "Department") and Secretary of Education Elisabeth DeVos, in her official capacity as the Secretary of the Department. Massachusetts, Illinois, and New York (collectively, the "States") allege that the Defendants

have unlawfully certified as legally enforceable or owed the federal student loan debts of borrowers subject to violations of state law by Corinthian Colleges, Inc. ("Corinthian") for purposes of instituting involuntary collection against these students.  Furthermore, the Defendants have unlawfully rejected borrower defense to repayment claims that the Massachusetts and Illinois AGOs made on behalf of Corinthian borrowers.  The States also allege that the Defendants have unlawfully withheld or unreasonably delayed final agency action with respect to all borrowers who submitted individually-signed borrower defense to repayment claims, regardless of the school they attended.

     2.     The Defendants have engaged in these unlawful activities even though they have themselves established that Corinthian committed widespread fraud—conduct that violates the laws of each of the States.  In its own words, the Department "has found that between 2010 and 2014, Everest Institute, Everest College, and Everest University as well as WyoTech, misrepresented job placement rates for many of their programs of study."[1]  In addition, the Department identified substantially similar fraud across Corinthian's Heald College programs. Programs where the Department found fraud during this time period include nine programs at Corinthian's Massachusetts Everest Institute schools at Brighton and Chelsea (collectively, "Everest MA"); twenty-nine programs across six of Corinthian's Everest campuses in Illinois, as well as various in-person and online programs located in other states that enrolled Illinois residents (collectively "Corinthian IL"); and nine programs at Corinthian's Everest Institute Rochester in New York, as well as various in-person and online programs located in other states that enrolled New York residents (collectively "Corinthian NY").  The Everest MA, Corinthian

---

[1] *See Information About Debt Relief for Corinthian Colleges Students*, https://studentaid.ed.gov/sa/about/announcements/corinthian (accessed December 14, 2017).

IL, and Corinthian NY programs and enrollment dates for which the Department issued findings

of fraud are the "Designated Fraud Cohorts."[2]

3.      Massachusetts and Illinois have submitted borrower defense claims on behalf of

many of their residents, including each borrower in the Designated Fraud Cohorts.

4.      Over two years ago, on November 30, 2015, the Massachusetts AGO submitted a

borrower defense to repayment claim to the Department covering students who enrolled at

Everest Institute in Massachusetts from 2007 through 2014 (the "Massachusetts DTR

Application").  This claim for federal loan forgiveness, proffered to the Department by the

Massachusetts AGO on behalf of Everest students who enrolled in Massachusetts, outlined

illegal actions by the school, included over 2,700 pages of supporting documentation, and

specifically identified more than 7,000 students entitled to a loan discharge, including their

campus attended, program, credential level, and enrollment date.  The Massachusetts AGO later

submitted to the Department a copy of the Massachusetts Superior Court judgment the AGO

obtained against the school for violations of the Massachusetts Consumer Protection Act, M.G.L.

c. 93A, § 1, *et seq.*

5.      Similarly, on December 16, 2016, the Illinois AGO sent a letter to the Department

requesting discharge, pursuant to borrower defense to repayment, of all loans where the

Department's own data indicated that the student attended a cohort with a finding of fraud.  The

letter attached a list of over 6,000 eligible students whose names and cohort information were

obtained from the Department.  The letter also indicated that over a period of just ten days, the

Illinois AGO independently verified that over 900 students were in fact part of the Designated

---

[2] The full lists of programs and enrollment dates where the Department issued findings are
available at https://studentaid.ed.gov/sa/sites/default/files/ev-wy-findings.pdf and
https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf.

Fraud Cohorts.  On January 4, 2017, the Illinois AGO sent a letter to the Department identifying

over 200 additional students that were also independently verified as being part of the

Designated Fraud Cohorts (collectively the "Illinois DTR Application").

6.      Both the underlying student loan promissory notes and Department regulations

require the Department to recognize school violations of state law as a defense to repayment of

federal student loans.  The Department's failure to do so, and its ongoing collection activity

relating to these loans, should be declared unlawful by this Court.

7.      This complaint alleges that the Defendants have violated the Administrative

Procedure Act (the "APA"), 5 U.S.C. § 706, in at least three ways.

8.      First, the Defendants have unlawfully engaged in involuntary collection activities

against students who were subject to Corinthian's violations of state law, such as those in the

Designated Fraud Cohorts.[3]  The Defendants may not certify that debts are legally enforceable or

owed when they know or should know that they are not, regardless of whether the relevant

borrowers submitted individually-signed borrower defense to repayment claims.  The

Defendants' actions are arbitrary and capricious and without observance of procedure required

by law, in violation of the APA, 5 U.S.C. §§ 706(2)(A) & (D).

9.      Second, the Defendants have unlawfully refused to discharge the student loans of

many Corinthian borrowers, even though the Defendants know or should know that the

---

[3] Before referring a debt for involuntary collection, the Defendants must determine that the debt
is "legally enforceable" for purposes of administrative offset, *see* 31 U.S.C. §§ 3716(6)(A) &
3720A, or "owed" for purposes of administrative wage garnishment, *see* 31 U.S.C. § 3720D(a).
A debt is not legally enforceable or owed when the debt is subject to a valid defense against
repayment, including "any act or omission of the school attended by the student that would give
rise to a cause of action against the school under applicable State law." 34 C.F.R. §
685.206(c)(1).

borrowers have valid defenses to repayment.[4]  The Massachusetts and Illinois AGOs raised

borrower defense to repayment claims on behalf of these borrowers and submitted supporting

evidence through their DTR Applications and, in the case of Massachusetts, a state court

judgment against Corinthian. The Defendants' actions are arbitrary and capricious and without

observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 706(2)(A) & (D).

10.     Third, the Defendants have unlawfully withheld or unreasonably delayed action

on all individually-signed borrower defense to repayment claims relating to any school in

violation of the APA, 5 U.S.C. § 706(1).  On January 20, 2017, the Defendants stopped

approving any borrower defense to repayment claims.  As of July 7, 2017, the backlog of

borrower defense claims awaiting Department review, decision, or adjudication ballooned to

over 65,000 claims, further swelling to approximately 95,000 claims by November 14, 2017.

This is especially egregious with respect to Corinthian borrowers in the Designated Fraud

Cohorts because the Department has already determined that these borrowers were subject to

fraud.

11.     The States ask this Court to find that the Defendants may not initiate involuntary

collection activities where the Defendants made findings of fraud or possess significant evidence

that Corinthian violated state law, and to further find that where borrowers fall within the

Defendants' findings of fraud or otherwise have valid state law defenses to repayment, the

Department must discharge their student loans.  Finally, the States ask this Court to find that the

Defendants may not unlawfully withhold or unreasonably delay final agency action regarding

---

[4] If a borrower has a valid defense against repayment, the Department must notify "the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay."  34 C.F.R. § 685.206(c)(2).

borrower defense to repayment claims (whether raised by Corinthian borrowers or borrowers attending other schools).

## PARTIES

12.     The Plaintiffs in this action are States which have been harmed and whose residents have been harmed by the Defendants' actions, specifically the Commonwealth of Massachusetts, the State of Illinois, and the State of New York.

13.     The Plaintiffs have standing to bring this action, as *parens patriae* on behalf of thousands of negatively-affected Corinthian borrowers, through their sovereign interests in enforcing the laws of their States and protecting their residents from unfair and deceptive acts and practices, and through their proprietary interests as operators of public colleges and universities and administrators of public benefit programs in their respective States.

14.     Each State has a compelling interest in protecting its residents from fraud and in ensuring that victims of fraud obtain adequate relief.  Each State's ability to protect its residents from fraud is severely limited when the Department does not properly discharge the federal student loans of defrauded borrowers, especially where consumer relief cannot be obtained from the school itself due to the school's insolvency.

15.     In addition, each State has a compelling interest in ensuring that defrauded residents are afforded their rights to a loan discharge under federal law.  Each State also has a compelling interest in ensuring that defrauded residents are not subjected to unlawful involuntary collection action by the Department.

16.     Moreover, each State also has standing because it is directly harmed when students are prevented from attending public education institutions in its State, such as community colleges and public universities, because of their outstanding loan balances or because their loan status (*e.g.*, borrowers currently in default) prohibits them from receiving any

6

additional federal funding.  *See* 34 C.F.R. § 685.200(d).  This deprives the States of these students' potential tuition dollars, damaging each State's proprietary interests.  In addition, the States pay out certain state benefits, such as food stamps, Medicaid funds, or housing assistance, to defrauded borrowers who would likely not require such assistance in the absence of their heavy debt burden and/or difficulties obtaining employment.  This further damages each State's proprietary interests.  Finally, defrauded borrowers are less likely to contribute to each State's economy because their heavy debt burden and inability to pursue additional education opportunities may create insurmountable hurdles to financial stability.

### Plaintiff Commonwealth of Massachusetts

17.     The Commonwealth of Massachusetts, represented by Attorney General Maura Healey, is a sovereign state of the United States of America.

18.     Corinthian operated two campuses in Massachusetts: Everest Institute, Brighton; and Everest Institute, Chelsea.  Corinthian also enrolled Massachusetts residents in online programs offered through Corinthian schools located outside Massachusetts.

19.     Through its DTR Application, the Massachusetts AGO submitted borrower defense to repayment claims to the Department covering more than 7,000 Massachusetts borrowers.  The Massachusetts AGO also held 19 workshops and assisted 1,350 Everest MA borrowers submit individually-signed borrower defense to repayment applications to the Department.  More than 600 Massachusetts borrowers have individually-signed Corinthian borrower defense to repayment claims still awaiting action by the Department.

20.     The Department has brought involuntary collection actions against Everest MA borrowers, including Massachusetts borrowers who are members of the Designated Fraud Cohorts and borrowers covered by the Massachusetts DTR Application.

21.     Corinthian's fraudulent conduct, including misrepresenting job placement rate statistics, violated Massachusetts state law, including Massachusetts General Laws Chapter 93A, and thus provides a defense to repayment of borrowers' federal student loans.

### Plaintiff State of Illinois

22.     The People of the State of Illinois are represented by Lisa Madigan, the Attorney General of the State of Illinois, which is a sovereign state of the United States of America.

23.     Corinthian operated seven campuses in Illinois: Everest College, Bedford Park; Everest College, Burr Ridge; Everest College, Chicago; Everest College, Melrose Park; Everest College, Merrionette Park; Everest College, North Aurora; and Everest College, Skokie.  All Illinois campuses were taught out by August 2015.  Corinthian also enrolled thousands of Illinois residents in both online programs offered through Corinthian schools located outside of Illinois, and in brick and mortar campuses located in other states.

24.     Through its DTR Application, the Illinois AGO requested that the Department discharge all loans of Corinthian IL borrowers within the Designated Fraud Cohorts.  Over 6,000 Illinoisans are members of the Designated Fraud Cohorts.  The Illinois AGO also conducted outreach to Illinois borrowers who are members of the Designated Fraud Cohorts concerning the borrower defense to repayment loan discharge application process.  More than 3,000 Illinois borrowers have individually-signed Corinthian borrower defense to repayment claims still awaiting action by the Department.

25.     The Department has brought involuntary collection actions against Corinthian IL borrowers, including Illinois borrowers who are members of the Designated Fraud Cohorts and covered by the Illinois DTR Application.

26.     Corinthian's fraudulent conduct, including misrepresenting job placement rate statistics, violated Illinois state laws, including the Illinois Consumer Fraud Act 815 ILCS 505/1 *et seq.*, and thus provides a defense to repayment of borrowers' federal student loans.

## Plaintiff State of New York

27.     The State of New York, represented by Attorney General Eric T. Schneiderman, is a sovereign state of the United States of America.

28.     Corinthian operated a campus in Rochester, New York, until April 27, 2015 and also enrolled thousands of New Yorkers in online and in-person programs offered through Corinthian schools located outside of New York.

29.     At least 3,290 New Yorkers are members of the Designated Fraud Cohorts.  The New York AGO conducted outreach to New York borrowers who are members of the Designated Fraud Cohorts concerning the borrower defense to repayment loan discharge application process.  Nearly 900 New York borrowers have individually-signed Corinthian borrower defense to repayment claims still awaiting action by the Department.

30.     The Department has brought involuntary collection actions against New York Corinthian borrowers, including New York borrowers who are members of the Designated Fraud Cohorts.

31.     Corinthian's fraudulent conduct, including misrepresenting job placement rate statistics, violated New York state laws, including New York General Business Law §§ 349 and 350 and New York Executive Law § 63(12), and thus provides a defense to repayment of borrowers' federal student loans.

**Defendants**

32.     Defendant United States Department of Education is an executive agency of the United States government.  The Department's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

33.     Defendant Elisabeth DeVos is the Secretary of the United States Department of Education.  Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

## JURISDICTION AND VENUE

34.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 702 & 706, and the Higher Education Act, 20 U.S.C. § 1082.  In addition, the Court has jurisdiction to compel an officer or employee of the Department, including the Secretary, to perform his or her duty under 28 U.S.C. § 1361.

35.     This is an action against an officer and agency of the United States.  Therefore, venue is proper in this Court under 28 U.S.C. § 1391(e).  Additionally, venue is proper in this Court because the Department resides in this judicial district and Secretary DeVos performs her official duties in this judicial district, and many of the events giving rise to this action took place in this judicial district.

36.     This Court is authorized to award the requested declaratory and injunctive relief, including monetary relief, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706, the Mandamus Act, 28 U.S.C. § 1361, and the Higher Education Act, 20 U.S.C. § 1082.

## FACTUAL ALLEGATIONS

### A.     Regulatory Framework

37.     The Department oversees and is responsible for the federal student loan program under Title IV of the Higher Education Act, 20 U.S.C. § 1071, *et seq.*  The federal student loan

programs are central components of the financial aid provided to students under Title IV.  These

programs are designed to provide critical assistance to students and to expand access to higher

education for students who could not otherwise afford to pursue a degree or certificate.

38.     Federal student loan debts are not dischargeable in bankruptcy except where

repaying the loan would cause undue hardship.  *See* 11 U.S.C. § 523(a)(8).

39.     The Department possesses extensive authority to collect defaulted student loans,

including the power to seize federal tax refunds and certain government benefits and

administratively garnish wages through the Debt Collection Improvement Act, 31 U.S.C. § 3701,

*et seq.* (the "Debt Collection Act").  *See* 31 U.S.C. §§ 3711, 3716, 3720A, & 3720D.

40.     Although the Department has widespread authority to collect defaulted student

loan debt, this power is limited in certain critical ways.

41.     In order to seize federal tax refunds and certain government benefits, the

Department can refer debts to the Department of Treasury's Bureau of the Fiscal Service (the

"Fiscal Service") through the Treasury Offset Program ("TOP"), which is governed by the Debt

Collection Act and its implementing regulations promulgated by the Departments of Education

and Treasury.  But before referring any debt for involuntary collection through TOP, the

Department must determine that the debt is "legally enforceable."  *See* 31 U.S.C. §§ 3716(6)(A)

& 3720A.

42.     The Department of Treasury defines "legally enforceable" in regulations

implementing TOP as follows:

> Legally enforceable refers to a characteristic of a debt and means there has been a
> final agency determination that the debt, in the amount stated, is due, and there
> are no legal bars to collection by offset.  Debts that are not legally enforceable for
> purposes of this section include, but are not limited to, debts subject to the
> automatic stay in bankruptcy proceedings or debts covered by a statute that
> prohibits collection of such debt by offset.  For example, if a delinquent debt is

the subject of a pending administrative review process required by statute or regulation, and if collection action during the review process is prohibited, the debt is not considered legally enforceable for purposes of this section. Nothing in this section is intended to define whether a debt is legally enforceable for purposes other than offset under this section.

31 C.F.R. § 285.5(b).

43.     In guidance the Department provided a vendor in November 2015, it noted that debts that are considered unenforceable, without merit, unsubstantiated, or suspended must be excluded from selection for certification for purposes of TOP. The Department also noted that any debt currently being evaluated under, or already deemed eligible for, the various discharge processes must be excluded from selection. The Department provided similar guidance in November 2016 relating to the recertification of debts for purposes of TOP.

44.     Once the Department has notified a debtor of its intent to offset a debt, the Secretary may offset future years' tax refunds without providing the debtor with additional pre-deprivation notice. 34 C.F.R. §§ 30.22(d) & 30.33(a). But in order to effectuate future offsets, the Department must re-certify the debt to the Fiscal Service each year. This certification must be in writing and include certification that the debt continues to be legally enforceable. 31 C.F.R. § 285.5(d)(3)(i)(B) & (d)(7)(i).

45.     The Department has an ongoing obligation to immediately notify the Fiscal Service of any change in status of the legal enforceability of the debt. 31 C.F.R. §§ 285.2(d)(4) & 285.5(d)(10)(iv).

46.     The Department may also initiate administrative wage garnishment. The Department's administrative wage garnishment authority is governed by 31 U.S.C. § 3720D of the Debt Collection Act and 34 C.F.R. § 34.1, *et seq.* The Department can garnish wages to collect on a delinquent debt or claim.

47.     For purposes of administrative wage garnishment, debt or claim "means any amount of money, funds, or property that an appropriate official of the Department has determined an individual owes to the United States under a program we administer."  34 C.F.R. § 34.3.

48.     The Department may initiate a wage garnishment only if there is an enforceable debt to the United States under a program it administers.  It implicitly acknowledges this requirement by providing student borrowers the opportunity for an initial hearing concerning the enforceability of the debt.  *See* 34 C.F.R. §§ 34.6 & 34.8.

49.     Student loan borrowers may assert to the Department as a defense to repayment any act or omission by the school the student attended that would give rise to a cause of action against the school under state law.  34 C.F.R. § 685.206(c)(1); *see also* 20 U.S.C. § 1087e(h).  If the borrower's defense against repayment is successful, the Department must notify "the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay."  34 C.F.R. § 685.206(c)(2).

50.     The student loan promissory note also provides borrowers the right to assert defenses to repayment based on a school's violation of state law.  The following language is included in such notes:

> In some cases, you may assert, under applicable law and regulations, a defense against repayment of your loan on the basis that the school did something wrong or failed to do something that it should have done.  You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for.  If you believe that you have a defense against repayment of your loan, contact your servicer.

51.     The Department has instituted a process where students can submit individually-signed borrower defense to repayment claims on a form that the Department created, regardless of whether they are currently facing involuntary collection.

**B.     Widespread Evidence of Corinthian Fraud**

52.     The Department is well aware of acts and omissions by Corinthian that provide its former students a cause of action against the school under state law, and thus defenses to repayment.

### 1.     The Department Conducted Its Own Investigation and Issued Findings

53.     The Department's investigation into Corinthian's falsification of its placement rates began in the winter of 2013.  In January 2014, the Department asked Corinthian for data regarding its advertised placement rates.

54.     Following a back and forth during which the Department pressed Corinthian for placement rate data and Corinthian refused to provide that data, the Department placed Corinthian on heightened cash monitoring status in June 2014.

55.     The increased scrutiny on federal student aid payments exacerbated Corinthian's existing financial instability and the school nearly collapsed.  The Department was forced to step in and provide Corinthian with an immediate cash infusion through a June 2014 memorandum of understanding. Corinthian agreed to turn over the placement information requested by the Department, to sell many of its campuses within six months, and to teach-out and close others.

56.     In April 2015, the Department concluded part of its investigation into Corinthian's falsification of placement rates and issued a fine letter against Corinthian.  That fine letter concluded that Corinthian misled students about its programs by inflating placement rates at its Heald College locations.  Corinthian did so by, among other means, counting students as placed based on jobs they held before enrolling at Corinthian, creating temporary unsustainable

jobs for students and counting those students as placed, and counting students as placed when their jobs were unrelated to the education they received at Corinthian.  The Department notified Corinthian that it intended to fine Heald $30 million for those violations, and also ordered that Corinthian stop enrollments at those locations.

57.     On April 27, 2015, shortly after the Department notified Corinthian of its intention to impose a fine based on the falsified placement rates, Corinthian announced the closure of all its remaining schools, filed for bankruptcy in May 2015, and began the process of dissolution.

58.     The Department subsequently found that Corinthian defrauded its students in the Designated Fraud Cohorts.  Starting on June 8, 2015, the Department began announcing findings of fraud at Corinthian stemming from the misrepresentations of job placement rates.  The announcement covered hundreds of cohorts where the Department found fraud at Corinthian's Heald schools.

59.     On June 25, 2015, the Department announced the appointment of a special master, Joseph A. Smith, Jr., to advise the Department about borrower defense issues.  This appointment was in large part because of Corinthian's collapse, which resulted in the submission of large numbers of borrower defense to repayment claims.

60.     On November 17, 2015, the Department announced more findings that Corinthian had defrauded its students. The November announcement covered misrepresentations of job placement rates at Everest and WyoTech campuses in California and Florida and included many online programs that enrolled students nationwide, including students from Massachusetts, Illinois, and New York.

61.     On December 3, 2015, the Special Master for Borrower Defense specifically encouraged state attorneys general to submit evidence of fraud to the Department so that it could use that information to make findings related to borrower defense to repayment: "We continue to invite all state attorneys general to provide evidence of institutions' wrongdoing to me and the Department so that I can make determinations about the implications of the evidence on potential borrower defense claims."[5]

62.     On March 25, 2016, the Department announced still more findings that Corinthian had defrauded its students.  Then Secretary of Education John B. King, Jr. stated the following:

> Corinthian was more worried about profits than about students' lives.  Through these important partnerships with states' attorneys general, we are pleased to offer relief to Corinthian students who were defrauded.  And we will continue to take action to protect students and taxpayers from unscrupulous companies trying to profit off of students who simply want to better their lives.[6]

63.     Secretary King noted that the Massachusetts AGO "was instrumental in bringing forward evidence that Corinthian's two Everest Institute campuses in Massachusetts – Chelsea and Brighton – misrepresented their job placement rates to enrolled and prospective students." The Secretary also noted his gratitude for cooperation from other state attorneys general, including Illinois.

64.     Beginning in April 2016, the Department requested that states conduct outreach to their residents in the Designated Fraud Cohorts.  Beginning in July 2016, the Department sent forty-seven state attorneys general, including those of Illinois, Massachusetts, and New York,

---

[5] *Second Report of the Special Master for Borrower Defense to the Under Secretary, United States Department of Education*, Dec. 3, 2015, http://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-2.pdf.

[6] *Department of Education Press Release*, Mar. 25, 2016, https://www.ed.gov/news/press-releases/us-department-education-announces-path-debt-relief-students-91-additional-corinthian-campuses.

information on all residents of their respective states who enrolled in a Corinthian school from 2010 to 2014.  The information included program, campus, credential level, and date of first enrollment, the four factors necessary to determine if a borrower is in a cohort where the Department found fraud.

65.     Forty-seven attorneys general, including those of Illinois, Massachusetts, and New York, pooled resources through the National Association of Attorneys General and retained a settlement administrator at significant cost to coordinate contacting all borrowers in the cohorts where the Department found fraud nationwide.

66.     Building on the eligibility and verification work of the forty-seven attorneys general (including those of each of the States), the settlement administrator created a set of rules to sort eligible from ineligible students in the data that the Department sent to the participating states.  These rules were tested and refined in conjunction with the state attorneys general throughout the first quarter of 2017.

**2.   Attorneys General Investigated and Litigated Against Corinthian, Securing Judgments**

67.     Attorneys general also independently conducted investigations of Corinthian, shared evidence with the Department, and litigated against Corinthian.

68.     For example, on April 3, 2014, Massachusetts filed suit in Massachusetts Superior Court against Corinthian for violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 2.

69.     While litigation was pending, the Massachusetts AGO brought the issue of Corinthian's illegal acts, which provide defenses to loan repayment, to the attention of the Department.  The Massachusetts AGO submitted its DTR Application to the Department, together with more than 2,700 pages of evidence, on November 30, 2015.  This evidence was

obtained over the course of a thorough investigation.  During its review, the Massachusetts AGO

obtained records from Corinthian, its accreditor, its successor, lenders, and other parties;

reviewed over 650 survey responses from former students; conducted over 900 employment

verifications; and interviewed more than 100 former Corinthian employees and students.

70.     A key component of the evidence in the Massachusetts DTR Application involved

audits of the in-field job placement rates that Corinthian published for its Massachusetts

campuses.  The Massachusetts AGO audited these claimed placement rates for certain cohorts by

verifying the underlying individual job placements with the alleged employers, and in certain

cases, the students.  Through this process, the Massachusetts AGO determined that Corinthian

had inflated its in-field job placement rates by falsifying jobs, counting jobs regardless of field,

and counting temporary positions or unsustainable employment.  Compounding this deception,

student reports indicate that Corinthian's sales representatives routinely cited in-field job

placement rates that exceeded the falsified written rates.

71.     The Massachusetts DTR Application also provided significant evidence regarding

high-pressure sales tactics.  The evidence submitted with the Massachusetts DTR Application

shows that Corinthian often rushed and pressured students into uninformed and ill-advised

enrollment decisions.

72.     Additionally, the Massachusetts DTR Application included evidence that students

did not receive the education Corinthian promised.  Corinthian's sales representatives promised

students a high-quality, hands-on educational experience with professional instructors and small

classes; placement in relevant externships; and assistance with job placement, resume writing,

and interviewing.  But once students had signed enrollment contracts and promissory notes,

Corinthian failed to provide the promised education or career services upon which the students

were relying.  Many students reported a dangerous, inadequate, and inappropriate learning

environment.  There were consistent student reports of cheating, on-campus violence, and drug

use, as well as apathetic teachers and unresponsive administrators.

73.    In total, the Massachusetts DTR Application requested student loan discharges for

all Everest MA students who enrolled between 2007 and 2014.  The Massachusetts AGO sought

this relief because of the following violations of state law, all carefully documented by student

affidavits, survey responses, and other evidence:

a.    Corinthian misled and deceived students about in-field job placement
rates;

b.    Corinthian misrepresented the availability of career services;

c.    Corinthian engaged in high pressure sales tactics;

d.    Corinthian misrepresented the quality and type of education and
instruction;

e.    Corinthian misrepresented the qualifications of instructors;

f.    Corinthian misrepresented the learning environment and failed to provide
a safe learning environment;

g.    Corinthian misrepresented the salaries of graduates;

h.    Corinthian misrepresented the transferability of credits;

i.    Corinthian misrepresented student externships; and

j.    Corinthian misled students about their ability to benefit from its programs.

74.    After the Massachusetts AGO submitted its DTR Application to the Department,

Massachusetts continued litigating against Corinthian in Massachusetts Superior Court, filing for

summary judgment.  On June 6, 2016, the court found Corinthian liable for violating the

Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 1, *et seq*.  After a hearing on

damages, the court ordered Corinthian to pay restitution representing refunds of all costs paid by

all graduates of the Everest MA's Dental Assistant, Medical Assistant, Medical Administrative

Assistant, Medical Insurance Billing and Coding, and Massage Therapy programs who enrolled between July 1, 2007 and June 30, 2014.  These programs comprise all programs offered by Corinthian at Everest MA during this time period.

75.     Corinthian, insolvent and in bankruptcy, did not pay and was incapable of paying the judgment that Massachusetts secured.  But this judgment demonstrates that Corinthian violated Massachusetts law.  The Department was aware of the judgment due to various conversations with Massachusetts AGO staff, and in any event, was again formally notified and provided a copy of the judgment on May 10, 2017.

76.     In December 2016, the Department asked the Massachusetts AGO for a list of the Everest MA students who were in the Designated Fraud Cohorts.  The Massachusetts AGO provided this dataset to the Department on December 7, 2016, and had previously provided it to the Department on April 8, 2016.  The dataset was a subset of data that Corinthian provided to the Massachusetts AGO during its investigation.  The Massachusetts AGO verified the accuracy of the dataset, including the listed enrollment dates and program names, with over 1,200 Everest MA students when it assisted those students in submitting individually-signed borrower defense to repayment applications.  On December 13, 2017, Massachusetts AGO staff members spoke to senior representatives of the Department to explain why the dataset was sufficient to identify Massachusetts students in the Designated Fraud Cohorts.  The Department's representatives appeared to agree that the dataset was sufficient to identify Massachusetts students in the Designated Fraud Cohorts.

77.     Two other attorneys general also investigated and litigated against Corinthian. The California Attorney General brought an action against Corinthian relating to its campuses in that state and secured a judgment against Corinthian.  In addition, the Wisconsin Attorney

General filed a lawsuit against Corinthian for violations of Wisconsin law related to misrepresented job placement rates.

### 3. Illinois Investigated Corinthian, Shared Findings with the Department, and Identified the Borrowers in the Designated Fraud Cohorts

78.     In Illinois, Corinthian operated seven campuses as well as online education programs.  Corinthian did business in Illinois under the names Everest College and Olympia College.

79.     In 2011, the Illinois AGO began investigating Corinthian for deceptive practices, ultimately collecting more than 100,000 documents over the course of the investigation.

80.     In the course of marketing and selling their programs to Illinois consumers, Corinthian engaged in a variety of unlawful, deceptive, unfair and abusive conduct, including misrepresentations and omissions related to job placement rates.

81.     For example, the Illinois AGO found in the course of its investigation that Corinthian misrepresented its in-field job placement rate to prospective students by attaching outdated job placement data to its applications, counting students as placed when they were unemployed or only had temporary positions, counting students who were employed prior to entering Corinthian's programs as placed, counting placements regardless of field, counting students as placed in fields that required state licensure when the students did not pass the licensing exam, and making oral misrepresentations regarding placement rates.

82.     Most students who attended Corinthian did so in order to improve their job prospects and were damaged by misrepresentations about their ability to find work after graduation.  Indeed, many students are left saddled with debt they cannot pay off because they cannot find employment following graduation, or cannot find employment with sufficient

income to repay the student loans used to attend Corinthian. Some students are even disqualified from certain positions due to their debt and resulting poor credit.

83.     Starting in June 2015, the Illinois AGO began sharing information and findings from its investigation with the Department.

84.     The Department ultimately found that Corinthian defrauded students in twenty-nine programs across six Everest College campuses in Illinois between 2010 and 2014.

85.     As described in paragraph 64, in July 2016, the Department sent the Illinois AGO information on all Illinois residents who enrolled in a Corinthian school from 2010 to 2014. The information included program, campus, credential level, and date of first enrollment, the four factors necessary to determine if a student was in a cohort where the Department found fraud.

86.     Thereafter, the Illinois AGO engaged in a wide-ranging effort to identify eligible students and to verify that the Department's data was accurate.

87.     The Illinois AGO compared the cohort data offered by the Department with enrollment data and course catalogs obtained over the course of the Illinois AGO's investigation into Corinthian.

88.     In addition, the Illinois AGO made calls and sent emails to students to verify that the students that were eligible based on the Department's data were in applicable cohorts.

89.     As part of this verification, the Illinois AGO identified over 3,000 students the Department's data indicated were in the Designated Fraud Cohorts who attended brick-and-mortar Corinthian schools located in Illinois.

90.     Over the course of just two weeks in December 2016, the Illinois AGO was able to verify that over 900 of that group of more than 3,000 individuals were in the cohorts indicated in the Department's data.

91.     On December 16, 2016, after making these determinations, the Illinois AGO sent a letter to the Department informing it of the Illinois AGO's verification process and the reliability of the Department's data.  The letter requested discharge of all loans where the Department's data indicated that the student attended a cohort with a finding of fraud, and included a list of the eligible students.  The Illinois AGO indicated the independently verified students within that list.

92.     On January 4, 2017, the Illinois AGO sent a letter to the Department identifying over 200 additional students it was able to confirm attended the brick-and-mortar Illinois campuses and programs for which the Department found fraud.

93.     In total, the Illinois AGO *verified* over 1,000 students as being in the fraudulent cohorts identified by the Department and as having attended brick-and-mortar Corinthian institutions in Illinois.

94.     The Department has not responded to the Illinois AGO's December 16, 2016 discharge application.

95.     While the Illinois AGO's request for group discharge was pending, the Illinois AGO contacted all Illinois residents in the Designated Fraud Cohorts and urged them to fill out a borrower defense attestation form.

96.     As noted in paragraphs 65 and 66, the Illinois Attorney General and other attorneys general pooled resources through the National Association of Attorneys General and retained a settlement administrator at significant cost to coordinate contacting all borrowers in the cohorts where the Department found fraud nationwide.  The settlement administrator created a set of rules to sort eligible from ineligible students in the data that the Department sent to the

participating states.  These rules were tested and refined in conjunction with the state attorneys general throughout the first quarter of 2017.

97.     In April 2017, the Illinois AGO mailed over 5,800 Illinois residents in the Designated Fraud Cohorts and urged them to fill out attestation forms.

98.     In September 2017, the Illinois AGO mailed over 300 more Illinois residents in the Designated Fraud Cohorts and urged them to fill out attestation forms.

99.     The Illinois AGO expended significant resources to identify and verify the eligible borrowers in Illinois and to inform those borrowers about the borrower defense provided by the Department.  These resources included extensive employee time, the cost of the settlement administrator, IT expenses, mailing expenses, and telephone expenses.

100.    As of July 7, 2017, the Department had 3,049 pending individually-signed borrower defense applications from Illinois residents who attended Corinthian.

### 4.  The Consumer Financial Protection Bureau Also Sued Corinthian and Secured a Judgment

101.    Law enforcement efforts against Corinthian were not limited to state agencies.  At the federal level, the Consumer Financial Protection Bureau (the "CFPB") also sued Corinthian in federal district court.

102.    In 2014, the CFPB filed a lawsuit against Corinthian alleging that for years the school had induced prospective students to enroll through false and misleading representations about its graduates' career opportunities and likelihood of obtaining jobs upon graduation by using inflated job placement statistics.  The CFPB ultimately obtained a judgment against Corinthian in this litigation.

103.    The Department is aware of the judgment against Corinthian entered in the CFPB litigation.

## C.     The Department Acts Unlawfully

### 1.   The Department Continues Involuntary Collections

104.    Even though the Department found that Corinthian defrauded students and is also aware of the various investigations and lawsuits against Corinthian, the judgments secured by state attorneys general and the CFPB, and the evidence submitted in the Massachusetts and Illinois DTR Applications, it continues certifying as legally enforceable the Corinthian-related debts of borrowers, including borrowers in the Designated Fraud Cohorts.  It seizes tax refunds and government benefits and administratively garnishes wages.

105.    As of late 2016, more than 30,000 Corinthian borrowers nationwide were subject to administrative offset.  More than 4,000 more were subject to wage garnishment.

106.    Students may submit individual borrower defense to repayment claims to avoid involuntary collection, but some borrowers subject to Corinthian's unfair practices have not done so.  Moreover, the Department does not remove a loan from default when a borrower submits a borrower defense to repayment claim.

107.    There are various reasons why borrowers may not have submitted individual requests for student loan discharge.  Some borrowers may never have been contacted regarding their eligibility for debt relief because they changed addresses or other contact information.  Other borrowers may not have read carefully (if at all) notices regarding their student loans, meaning they never learned they were potentially eligible for debt relief.  These borrowers may view any communications regarding their debts with well-founded suspicion: former Corinthian students and indeed many other student loan borrowers have been subject to frequent solicitations from for-profit companies who falsely promise student loan debt relief, typically for a fee.

108.   The following examples illustrate involuntary collection activity instituted by the Department against borrowers in the Designated Fraud Cohorts who have not submitted individually-signed defenses to repayment, or who submitted the individually-signed defense to repayment after involuntary collection had already occurred:[7]

    a.    Borrower 1, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $3,826 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around August 18, 2017.

    b.    Borrower 2, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of his entire $472 federal tax refund for the year 2016.  He submitted an individually-signed borrower defense to repayment claim on or around April 3, 2017.

    c.    Borrower 3, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $512 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around May 3, 2017.

    d.    Borrower 4, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $1,900 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around April 14, 2017.

    e.    Borrower 5, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $1,275 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around September 14, 2017.

    f.    Borrower 6, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $1,041 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around September 5, 2017.

    g.    Borrower 7 is the father of a student within the Designated Fraud Cohorts. He took a Parent PLUS loan to help pay for his daughter's education at Everest MA.  He was subjected to involuntary collection, including the offset of $166.50 of his $1,100 monthly social security check in July 2017. He submitted an individually-signed borrower defense to repayment claim on or around July 12, 2017.  His daughter submitted an individually-

---

[7] The borrowers in this list are examples and do not constitute the complete universe of borrowers who were subjected to involuntary collections.

signed borrower defense to repayment claim on or around May 11, 2016. Thus, even prior to Borrower 7's submission, the Department was aware that the student to which his loans related had alleged that Corinthian had violated state law.

h.  Borrower 8, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of $4,478 from her federal tax refund for the year 2016. She submitted an individually-signed borrower defense to repayment claim on or around September 14, 2017.

i.  Borrower 9, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of $4,635 from her federal tax refund for the year 2015 (taken on April 20, 2016). She submitted an individually-signed borrower defense to repayment claim on or around September 25, 2017.

j.  Borrower 10, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $3,491 federal tax refund for the year 2016. She has not yet submitted an individually-signed borrower defense to repayment claim.

k.  Borrower 11, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $10,216 federal tax refund for the year 2016. While her husband was able to dispute a portion of the refund offset via an Injured Spouse Allocation, she did not receive the entire refund back. She submitted an individually-signed borrower defense to repayment claim on or around July 19, 2017.

l.  Borrower 12, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire approximately $7,000 federal tax refund for the year 2016 as well as having her wages garnished. She submitted an individual-signed borrower defense to repayment claim on or around April 26, 2017.

m.  Borrower 13, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including administrative wage garnishment in effect through September 12, 2016. She submitted an individually-signed borrower defense to repayment claim on or around November 8, 2016.

n.  Borrower 14, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her federal tax refund for the year 2016. She submitted an individually-signed borrower defense to repayment claim in or around May of 2017.

109.  In each example listed above, the Department knew that these individuals were in programs subject to misleading job placement statistics, as well as other violations of state law.

Nevertheless, the Department certified their debts as legally enforceable and seized tax refunds or government benefits.

110.    Even for borrowers enrolled in programs about which the Department has not issued findings, the Department has evidence of violations of state law that provide legal defenses to repayment.  The Department cannot ignore evidence submitted by the States, including through DTR Applications, when determining whether a debt is legally enforceable for purposes of administrative offset or owed for purposes of administrative wage garnishment.  Nor can it ignore the findings and judgments of state courts regarding Corinthian's violations of state law.

### 2. The Department Refuses to Discharge Everest MA and Corinthian IL Student Loans

111.    Not only has the Department engaged in involuntary collections, it has constructively rejected without comment the borrower defense to repayment claims asserted by the Massachusetts and Illinois AGOs in their DTR Applications.

112.    The Massachusetts DTR Application was made on behalf of Corinthian students who enrolled at Everest MA between 2007 and 2014.  With its DTR Application, the Massachusetts AGO submitted an exhibit that identified each student on whose behalf the AGO made the request.  The Massachusetts AGO requested that the Department "provide a swift, wholesale, and automatic discharge . . . for each of Corinthian's [Massachusetts] students," including more than 7,000 students entitled to a loan discharge specifically listed in the exhibit.

113.    The Massachusetts AGO's DTR Application included survey responses, affidavits, and statements from many specific students (not all of whom submitted individually-signed defense to repayment claims).  The Department has specific information about

Corinthian's conduct with respect to those individuals, even if they did not submit individually-signed borrower defense to repayment claims.

114.     The Massachusetts AGO's DTR Application also specifically identified other students, who did not provide survey responses, affidavits, or individually-signed defense to repayment claims.  The Massachusetts AGO noted that these students were also subjected to the unlawful practices and entitled to loan discharges.  As Massachusetts' chief law enforcement agency, the Massachusetts AGO has the authority under state law to file claims on behalf of citizens of the Commonwealth.  When the Massachusetts AGO submitted its DTR Application, it was submitting a borrower defense to repayment claim on behalf of each student it listed in the exhibit, including each student in the Designated Fraud Cohorts.

115.     The Illinois AGO's DTR Application was made on behalf of all Illinois Corinthian students contained in the Designated Fraud Cohorts.  The Illinois AGO submitted exhibits identifying each student in the Designated Fraud Cohorts.  The DTR Application specifically requested group discharge "based on my office's detailed analysis and verification of the student information provided by the Department."

116.     The Illinois AGO used information obtained in its investigation of Corinthian, along with phone calls and emails, to independently verify that the Department's data used to determine which Illinois residents attended the Designated Fraud Cohorts was correct.  Over 3,000 students attended Designated Fraud Cohorts at Illinois brick-and-mortar campuses.  The Illinois AGO independently verified that over 1,000 of those students were in the Designated Fraud Cohorts.  In its DTR application, the Illinois AGO included sworn affidavits attesting to the process and verification of these individual students.  In addition, the Illinois AGO used course catalogs obtained in its investigation to confirm that the credentials listed in the

Department's data (diploma, associate's degree, bachelor's degree, etc.) matched the credentials listed in the Department's findings of fraud.  The Illinois AGO included a memo on this analysis in the Illinois DTR Application.  Based on that verification, the Illinois AGO determined that the Department's data was reliable, and requested discharge for all Illinois residents in the Designated Fraud Cohorts.

117.    When the Illinois AGO submitted its DTR Application, it was submitting a borrower defense to repayment claim on behalf of each student it listed.

118.    The Department has constructively rejected the borrower defense claims made in the Massachusetts DTR Application (submitted over two years ago) and the Illinois DTR Application (submitted a year ago), each of which was submitted on behalf of the identified borrowers.  The Department has not granted the requested discharges and continues collection activities against identified students.

119.    The Department has further indicated, in an ongoing private litigation, that it does not consider the DTR Applications to be borrower defense to repayment claims, stating that the Department "was not required to consider the [DTR Application] from the Massachusetts Attorney General to be a 'borrower defense claim' by the [plaintiffs in that matter]." Defendants' Reply Brief at 12, *Williams v. DeVos*, No. 16-11949, ECF No. 26 (D. Mass. March 31, 2017).

120.    The borrower defense regulation, 34 C.F.R. § 685.206(c), does not include or describe a specific form that must be submitted to present a borrower defense to repayment claim.  The form the Department created is an option, but not an exclusive route to filing such a claim (nor, absent notice and comment, could it be).

121.    In fact, the Department has previously taken the position that it can grant group discharges.  In January 2017, the Department announced that all borrowers who used federal student loans to attend the American Career Institute in Massachusetts would be granted automatic borrower defense discharges.

122.    The Department's rejection of the Massachusetts and Illinois DTR Applications and refusal to grant student loan discharges has harmed Corinthian borrowers, subjecting them to continuing collection activities.  The Department appears to take the position that no evidence that a state might submit, no matter how compelling, could provide a defense to repayment for any individual student.  This even appears to apply to the state court judgment that Corinthian systematically violated state law, which directs that all Everest MA graduates who enrolled between July 1, 2007 and June 30, 2014 are entitled to relief.

### 3.    The Department Refuses to Process Borrower Defense to Repayment Claims

123.    Even if the Department could limit relief to borrowers who submitted individually-signed borrower defense to repayment claims, which it cannot, it is still acting unlawfully.  Since January 20, 2017, the Department has not approved any pending borrower defense to repayment claims, including those submitted individually by former Corinthian students.[8]

124.    As of July 7, 2017, 65,149 borrower defense to repayment claims were pending, including 1,000 from Massachusetts residents (649 relating to Corinthian), 3,882 from Illinois residents (3,049 relating to Corinthian), and 1,630 from New York residents (894 relating to Corinthian).  The Massachusetts and Illinois AGOs assisted many of these borrowers in

---

[8] Office of the Inspector General, *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process*, p. 3, December 8, 2017, https://www2.ed.gov/about/offices/list/oig/auditreports/fy2018/i04r0003.pdf.

submitting their borrower defense to repayment claims.  On November 14, 2017, Acting Under

Secretary of Education James Manning reported that the count of unprocessed borrower defense

to repayment claims had ballooned to approximately 95,000.  Moreover, the Washington Post

reported that at least 10,000 of the pending borrower defense applications have been

recommended for approval but have yet to be approved because "department officials are

refusing to pull the trigger."[9]

125.    The Department has the infrastructure in place to process claims.  More than

31,000 were processed prior to the change in administration, virtually all between December 1,

2015 and January 20, 2017.  According to the Office of the Inspector General for the Department

(the "OIG"), 27,986 of these claims were approved between July 1, 2016 and January 20, 2017.[10]

126.    The Department has committed to processing borrower defense to repayment

claims.  The Department created an online form for students to request debt forgiveness, and

conducted extensive outreach to Corinthian borrowers.  It also requested that States conduct their

own outreach campaigns to inform borrowers of their rights to obtain loan discharges.

127.    As of December 14, 2017, the Department's website still states that its findings of

fraud qualify defrauded borrowers for an expedited process:

> The Department has found that between 2010 and 2014, Everest Institute, Everest
> College, and Everest University ("Everest"), as well as WyoTech, misrepresented
> job placement rates for many of their programs of study. While borrower defense
> claims typically require the borrower to specifically show that his or her school
> violated state law, the Department's Everest and WyoTech findings qualify

---

[9] Danielle Douglas-Gabriel, *DeVos calls for another delay of rule to protect students from predatory colleges*, WASHINGTON POST, Oct. 24, 2017, https://www.washingtonpost.com/news/grade-point/wp/2017/10/24/devos-calls-for-another-delay-of-rule-to-protect-students-from-predatory-colleges/?utm_term=.872012bdcda7.

[10] Office of the Inspector General, *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process*, p. 3, Dec. 8, 2017, https://www2.ed.gov/about/offices/list/oig/auditreports/fy2018/i04r0003.pdf.

students enrolled in the covered programs and time periods to apply for a discharge of their federal Direct Loans through an expedited process using a simple attestation form.[11]

128.    The Department has repeatedly restated this commitment.  In a June 16, 2017

release postponing the effective date of new borrower defense to repayment regulations, the

Department took the position that "the postponement of the final regulations will not prevent

student borrowers from obtaining relief because the Department will continue to process

borrower defense claims under existing regulations that will remain in effect during the

postponement."  82 Fed. Reg. 27,621, 27,621 (June 16, 2017).  It made the same point when it

announced further delays to the regulations, stating that the Department "is continuing to process

borrower defense claims under the existing regulations."  82 Fed. Reg. 49,114, 49,115 (October

24, 2017).

129.    Contrary to its promises, the Department has stopped processing claims.  It has

indefinitely delayed taking final action.

130.    The Department has even stopped providing reports to senior officials regarding

borrower defense to repayment claims, noting in a July 7, 2017 letter that "[n]o recurring reports

are being provided pending the review of the borrower defense process by the new

Administration."[12]  It gave no indication when such a review might be completed.  The

Department has also stopped providing regulator reports to Congress and the public on borrower

defense discharges.

---

[11] *See Information About Debt Relief for Corinthian Colleges Students*,
https://studentaid.ed.gov/sa/about/announcements/corinthian (accessed Dec. 14, 2017).

[12] *See Letter from Acting Under Secretary James Manning to Senator Richard Durbin*, p. 3, July 7, 2017, https://www.durbin.senate.gov/imo/media/doc/17-010570%20Durbin%20Outgoing.pdf.

131.    The Department continues to provide no justification for such an unwarranted delay.

132.    On June 5, 2017, eighteen state attorneys general, including those of each of the States, the District of Columbia Attorney General, and the Executive Director of the Office of Consumer Protection of Hawaii sent a letter to the Department seeking to have the Department provide swift, automatic group discharge to students within the defrauded Corinthian cohorts, seeking further information about the delay in processing, urging the Department to extend the forbearances for borrowers whose borrower defense applications had been pending for more than twelve months, and outlining some concerns regarding the harms caused by delays in processing.[13]

133.    In that letter, attorneys general of the States and the other signatories urged "the Department to stop certifying these borrowers' debts as enforceable for purposes of the Treasury Offset Program or otherwise engage in involuntary collection against these borrowers while continuing to process these students' attestations as rapidly as practicable."

134.    On July 14, 2017, the Department responded to the June 5, 2017 letter from the state attorneys general.  The response did not address the state attorneys general request for automatic group discharge for students in cohorts where the Department found fraud or the request that involuntary collections for these students cease.

135.    The Department's delay in processing borrower defense to repayment claims is also contrary to direction from Congress.  In a September 2017 report, the Senate Committee on

---

[13] *See Letter from State Attorneys General to Secretary Elisabeth DeVos*, June 5, 2017, http://www.mass.gov/ago/docs/press/2017/borrower-defense-multistate-letter.pdf.

Appropriations directed the Department to "process applications as expeditiously as possible." S. Rep. No. 115-150, at 184 (2017).

136.    The Committee on Appropriations also directed the Department to "ensure that students are aware of their potential eligibility for relief by identifying and contacting borrowers who may qualify to assert a defense to repayment utilizing the program-level enrollment information provided to the Department by the states in 2016." *Id.*

137.    The OIG issued a report on December 8, 2017 regarding the borrower defense to repayment process.[14]  The OIG found that the Department's Federal Student Aid ("FSA") needs to improve its policies and procedures concerning the federal student loan borrower defense loan discharge process.  Specifically, the OIG recommended that FSA request approval to resume the review, approval, and discharge processes for qualifying borrower defense to repayment claims.

138.    Borrowers with pending borrower defense claims are harmed by the delays.  If a defaulted borrower has not requested a forbearance or collection stoppage, or the Department has failed to grant one that was requested, the borrower is subject to involuntary collection under the Department's current practices.  Borrowers with a forbearance in place continue to have interest accrue on their loans while they wait.  As the OIG noted in its December report, this means that delay may harm borrowers whose borrower defense to repayment claims are ultimately rejected. These borrowers will be responsible for some or all of the interest that accrued between the time they applied and the time the Department finally acts.[15]  Nationwide, more than $143 million in

---

[14] Office of the Inspector General, *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process*, Dec. 8, 2017, https://www2.ed.gov/about/offices/list/oig/auditreports/fy2018/i04r0003.pdf.

[15] Acting Under Secretary of Education Manning stated on November 14, 2017, that interest that accrues on loans for denied claims will be forgiven starting one year after the borrower defense

interest has accrued on loans of Corinthian borrowers with outstanding claims.[16]  Borrowers may also lose qualifying payments toward loan forgiveness in an income-driven repayment plan or pursuant to the Public Service Loan Forgiveness Program.

139.    Furthermore, delays in processing borrower defense to repayment claims are harmful because borrowers awaiting approval of their borrower defense to repayment claims continue to have delinquent or defaulted federal loans listed on their credit reports, making it more difficult to obtain employment, housing, or consumer loans.  The OIG also noted in its report that delay could adversely impact borrowers' credit reports.

140.    The delay in adjudication also poses difficulties for students who wish to continue their education.  In light of the inadequate education Corinthian and certain other for-profit schools provided, further schooling is often necessary for students to obtain gainful employment. But some students may have already taken out the maximum amount of federal student loans, and will be unable to access new loans to attend school while their existing debt remains owed. In addition, students who defaulted on their loans are ineligible to take out further federal student loans while their loans are in default.  The delay also deprives students of facts needed to make informed decisions about whether to re-enroll in school: such students cannot calculate their total post-education debt because it is unclear whether the debt will be discharged.

141.    This unjustified delay in adjudication also disqualifies former students from some employment opportunities based on adverse credit history or outstanding defaulted loans.

---

application is filed, but the promise was made in remarks to the Borrower Defense Negotiated Rulemaking Committee and has not been issued formally.

[16] *See Letter from Acting Under Secretary James Manning to Senator Richard Durbin*, p. 2, July 7, 2017, https://www.durbin.senate.gov/imo/media/doc/17-010570%20Durbin%20Outgoing.pdf. The sum included all unpaid interest on all outstanding loans (some of which may have accrued prior to submission of the relevant claims).  Previously paid or capitalized interest was not included.

Students also may be disqualified from certain employment which has a maximum amount of debt load an applicant can have and still be deemed eligible for the position.  For instance, borrowers have reported being disqualified for jobs at banking institutions and the Transportation Security Administration due to this outstanding federal student loan debt.

## CAUSES OF ACTION

### COUNT 1
### By All Plaintiff States
### Unlawful Collection Activity – Violation of the APA § 706 (2)

142.    The States repeat and re-allege paragraphs 1 through 141 of the Complaint.

143.    The Defendants violated the APA, 5 U.S.C. § 706, by making improper final agency determinations that the student loan debts of Everest MA borrowers who enrolled between 2007 and 2014, and of the Corinthian IL and Corinthian NY borrowers in the Designated Fraud Cohorts, were certifiable as legally enforceable for offset or owed for purposes of administratively garnishing wages.

144.    The Defendants' certifications of the debts of these borrowers for tax refund or government benefit offset were required to include final agency determinations that the debts, in the amount stated, were due and legally enforceable.  In order to administratively garnish wages, the Defendants were required to affirmatively determine that debts of these borrowers were owed.

145.    In light of the Department's own findings of fraud for the Designated Fraud Cohorts, possession of information identifying the borrowers in the Designated Fraud Cohorts, and possession of other strong evidence of wrongdoing at Everest and other Corinthian locations—all of which supports the valid defenses to repayment claims asserted in the Massachusetts and Illinois DTR Applications—the Defendants' final agency determinations that the student loan debts of these borrowers are legally enforceable for purposes of administrative

37

offset or owed for purposes of administrative wage garnishment are arbitrary and capricious and without observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 706(2)(A) & (D).

## COUNT 2
### By Massachusetts and Illinois
### Unlawful Refusal to Discharge Loans - Violation of the APA § 706 (2)

146.    Massachusetts and Illinois repeat and re-allege paragraphs 1 through 141 of the Complaint.

147.    The Defendants have constructively rejected the defense to repayment claims the Massachusetts and Illinois AGOs made on behalf of borrowers in their DTR Applications.  The Defendants have continued and initiated collection activity against students the AGOs identified in their DTR Applications, including students in the Designated Fraud Cohorts.

148.    The Defendants know or should know that Everest MA borrowers who enrolled between 2007 and 2014, and Corinthian IL borrowers in the Designated Fraud Cohorts, were subject to violations of state law and thus have valid defenses to repayment.

149.    The Defendants violated the APA, 5 U.S.C. § 706 (2)(A) & (D), by their refusal to grant discharges to all borrowers who enrolled at Everest MA between 2007 and 2014 and the Corinthian IL borrowers in the Designated Fraud Cohorts even though the Massachusetts and Illinois AGOs filed borrower defense to repayment claims on their behalf and the Defendants know or should know that these borrowers have valid defenses to repayment.  This refusal is arbitrary and capricious and without observance of procedure required by law.

150.    In the alternative, to the extent that the Defendants have not rejected the defense to repayment claims made in the Massachusetts and Illinois AGOs' DTR Applications, then the Defendants have not made a final agency determination on whether they will grant discharges to

all identified Everest MA and Corinthian IL students, and such agency action is unlawfully

withheld or unreasonably delayed in violation of the APA, 5 U.S.C. § 706(1).

### COUNT 3
### By All Plaintiff States
### Unlawfully Withheld or Unreasonably Delayed Final Agency Action - Violation of the APA § 706 (1)

151.    The States repeat and re-allege paragraphs 1 through 141 of the Complaint.

152.    The Defendants violated the APA, 5 U.S.C. § 706, by refusing to process

individually-signed borrower defense to repayment claims since the change in administration.

By their actions, the Defendants have indicated they will not make final agency decisions, or

alternatively are engaged in unreasonable delay, with respect to individually-signed borrower

defense to repayment claims.

153.    The Defendants have unlawfully withheld or unreasonably delayed agency action

in violation of the APA, 5 U.S.C. § 706(1).

### PRAYER FOR RELIEF

WHEREFORE, the States respectfully request that this Court enter judgment and order

for relief as follows:

A.    Declare that federal student loan debts incurred by or on behalf of Everest MA students who enrolled between 2007 and 2014 and Corinthian IL and Corinthian NY students in the Designated Fraud Cohorts are not legally enforceable for purposes of tax refund or benefit offset or owed for purposes of administrative wage garnishment;

B.    Declare that Everest MA students who enrolled between 2007 and 2014 and Corinthian IL and Corinthian NY students in the Designated Fraud Cohorts have valid defenses to repayment in any administrative or legal action taken by the Defendants to enforce or collect related student loan debts;

C.    Declare that the Defendants have unlawfully withheld or unreasonably delayed making final decisions on individually-signed borrower defense to repayment claims;

D. Strike the Defendants' final determination that federal student loans incurred by or on behalf of Everest MA students who enrolled between 2007 and 2014 and Corinthian IL and Corinthian NY students in the Designated Fraud Cohorts are legally enforceable or eligible for administrative wage garnishment as arbitrary and capricious or without observance of procedure required by law, in violation of the APA;

E. Order ancillary relief under 28 U.S.C. § 2202, including refunding amounts already seized from such Corinthian borrowers pursuant to the unlawful certification for offset or administrative wage garnishment;

F. Order the Department to discharge all related federal student loan debt incurred by or on behalf of Everest MA students who enrolled between 2007 and 2014 and Corinthian IL and Corinthian NY students in the Designated Fraud Cohorts; and

G. Grant such other and further relief as the Court may deem just and proper.

Dated: December 14, 2017

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS
MAURA HEALEY
MASSACHUSETTS ATTORNEY GENERAL

By: */s/ Timothy Hoitink*
Glenn Kaplan
Timothy Hoitink
Jennifer Snow
Assistant Attorneys General
Insurance and Financial Services Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2453 (Kaplan)
(617) 963-2465 (Hoitink)
(617) 963-2516 (Snow)
Glenn.Kaplan@state.ma.us
Timothy.Hoitink@state.ma.us
Jennifer.Snow@state.ma.us

THE PEOPLE OF THE STATE OF ILLINOIS
LISA MADIGAN
ILLINOIS ATTORNEY GENERAL

By: */s/ Joseph Sanders*
    Joseph Sanders
    Gregory W. Jones
    Assistant Attorneys General
    Consumer Fraud Bureau
    100 West Randolph Street, 12th floor
    Chicago, Illinois 60601
    312-814-6796 (Sanders)
    312-814-4987 (Jones)
    Fax: 312-814-2593
    jsanders@atg.state.il.us
    gjones@atg.state.il.us


STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
NEW YORK ATTORNEY GENERAL

By: */s/ Jane M. Azia*
    Jane M. Azia
    Chief, Bureau of Consumer Frauds and
    Protection
    Carolyn Fast
    Assistant Attorney General
    120 Broadway, 3rd floor
    New York, NY 10271
    (212) 416-8727 (Azia)
    (212) 416-6250 (Fast)
    Jane.Azia@ag.ny.gov
    Carolyn.Fast@ag.ny.gov