## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, PEOPLE OF THE STATE OF ILLINOIS, and STATE OF NEW YORK<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION and ELISABETH DEVOS, *in her official capacity as Secretary of Education,*<br><br>Defendants. | CIVIL ACTION NO: 17-2679 (TNM)<br><br>AMENDED COMPLAINT |

## INTRODUCTION

1.      The Commonwealth of Massachusetts, by and through Attorney General Maura Healey (the "Massachusetts AGO"), the People of the State of Illinois, by and through Lisa Madigan, Attorney General of the State of Illinois (the "Illinois AGO"), and the State of New York, by and through Attorney General Eric T. Schneiderman (the "New York AGO"), bring this action against the United States Department of Education (the "Department") and Secretary of Education Elisabeth DeVos, in her official capacity as the Secretary of the Department.

2.      Massachusetts, Illinois, and New York (collectively, the "States") allege that the Defendants have unlawfully collected federal student loan debts of borrowers subject to violations of state law by Corinthian Colleges, Inc. ("Corinthian").  Specifically, the Defendants have unlawfully (1) submitted such debts, with a certification that the debts are legally enforceable, to the Department of Treasury's Bureau of the Fiscal Service (the "Fiscal Service") through the Treasury Offset Program ("TOP") for purposes of administrative offset such as the seizure of tax refunds, even though the Defendants knew or should have known that the debts were not legally enforceable, and (2) issued wage garnishment orders to satisfy such debts, even

though the Defendants knew or should have known that the debts were not owed or legally enforceable.

3.      The Defendants have engaged in involuntary collection even though they have themselves established that Corinthian committed widespread fraud—conduct that violates the laws of each of the States.  In its own words, the Department "has found that between 2010 and 2014, Everest Institute, Everest College, and Everest University as well as WyoTech, misrepresented job placement rates for many of their programs of study."[1]  In addition, the Department identified substantially similar fraud across Corinthian's Heald College programs. Programs where the Department found fraud during this time period include nine programs at Corinthian's Massachusetts Everest Institute schools at Brighton and Chelsea (collectively, "Everest MA"); twenty-nine programs across six of Corinthian's Everest campuses in Illinois, as well as various in-person and online programs located in other states that enrolled Illinois residents (collectively "Corinthian IL"); and nine programs at Corinthian's Everest Institute Rochester in New York, as well as various in-person and online programs located in other states that enrolled New York residents (collectively "Corinthian NY").  The borrowers who attended Everest MA, Corinthian IL, and Corinthian NY programs and enrollment dates for which the Department issued findings of fraud are the "Designated Fraud Cohorts."[2]

4.      Massachusetts and Illinois submitted information and borrower defense claims to the Department on behalf of many of their residents, including each borrower in the Everest MA and Corinthian IL Designated Fraud Cohorts, containing further evidence of fraud at Corinthian.

---

[1] *See Information About Debt Relief for Corinthian Colleges Students*, https://studentaid.ed.gov/sa/about/announcements/corinthian (accessed Apr. 11, 2018).

[2] The full lists of programs and enrollment dates where the Department issued findings are available at https://studentaid.ed.gov/sa/sites/default/files/ev-wy-findings.pdf and https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf.

5.      Over two years ago, on November 30, 2015, the Massachusetts AGO submitted a borrower defense to repayment claim to the Department covering students who enrolled at Everest Institute in Massachusetts from 2007 through 2014 (the "Massachusetts DTR Application").  This claim for federal loan forgiveness, proffered to the Department by the Massachusetts AGO on behalf of Everest students who enrolled in Massachusetts, outlined illegal actions by the school, included over 2,700 pages of supporting documentation, and specifically identified more than 7,000 students entitled to a loan discharge, including their names, contact information, campus attended, program, credential level, and enrollment date. The Massachusetts AGO later submitted to the Department a copy of the Massachusetts Superior Court judgment the Massachusetts AGO obtained against the school for violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 1, *et seq*.

6.      Similarly, on December 16, 2016, the Illinois AGO sent a letter to the Department requesting discharge, pursuant to borrower defense to repayment, of all loans where the Department's own data indicated that the student attended a cohort with a finding of fraud.  The letter attached a list of over 6,000 eligible students whose names and cohort information were obtained from the Department.  The letter also indicated that over a period of just ten days, the Illinois AGO independently verified that over 900 students were in fact part of the Designated Fraud Cohorts.  On January 4, 2017, the Illinois AGO sent a letter to the Department identifying over 200 additional students that were also independently verified as being part of the Designated Fraud Cohorts (collectively the "Illinois DTR Application").

7.      Both the underlying student loan promissory notes and Department regulations require the Department to recognize school violations of state law as a defense to repayment of federal student loans.

8.      The Defendants have unlawfully engaged in involuntary collection activities against students in the Designated Fraud Cohorts, even though the Department found that these borrowers were subject to violations of state law.[3]  The Department possesses data indicating which borrowers fall into the Designated Fraud Cohorts.  The Defendants may not certify that debts are legally enforceable and submit them for administrative offset when they know or should know that the debts are not legally enforceable, regardless of whether the relevant borrowers submitted individually-signed borrower defense to repayment claims.  Nor may the Defendants determine that such debts are owed and issue wage garnishment orders when they know or should know that the debts are not owed or legally enforceable.  Therefore, the Defendants' actions are arbitrary and capricious and without observance of procedure required by law, in violation of the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 706(2)(A) & (D).

## PARTIES

9.      The Plaintiffs in this action are States which have been harmed and whose residents have been harmed by the Defendants' actions, specifically the Commonwealth of Massachusetts, the State of Illinois, and the State of New York.

10.      The Plaintiffs have standing to bring this action, through their quasi-sovereign interests as parens patriae in the health and economic well-being of their residents who are negatively affected by the Defendants actions, through their sovereign interests in enforcing the laws of their States and protecting their residents from unfair and deceptive acts and practices,

---

[3] When submitting a debt for administrative offset, the Defendants must certify that the debt is "legally enforceable." *See* 31 U.S.C. §§ 3716(c)(6)(A) & 3720A.  Prior to garnishing wages, the Defendants must determine that the debt is "owed." *See* 31 U.S.C. § 3720D(a).

and through their proprietary interests as operators of public colleges and universities and administrators of public benefit programs in their respective States.

11.     Each State has a compelling interest in protecting the economic well-being of its residents, particularly protecting them from fraud and in ensuring that victims of fraud obtain adequate relief.  The Massachusetts, Illinois, and New York AGOs all have authority to enforce state statutes prohibiting unfair and deceptive acts and practices.  When the Department seizes funds from defrauded borrowers, it undercuts the effectiveness of these statutes.

12.     Each State's ability to protect the economic well-being of its residents is also limited when the Department continues seizing the funds of defrauded borrowers, especially where consumer relief cannot be obtained from the school itself due to the school's insolvency. There are thousands of borrowers in the Designated Fraud Cohorts who are subject to involuntary collection if they default on their loans.  Involuntary collection can have a highly negative impact on the economic well-being of borrowers and the broader community.  For instance, many individuals receive large income subsidies in their tax returns, including the Earned Income Tax Credit ("EITC"), which can help families avoid extreme poverty. Furthermore, the EITC has a positive effect on workforce participation of single parents, further benefitting the economic well-being of the States' residents.[4]  As such, seizure of tax refunds would have the opposite effect as increasing the refund through the EITC, thereby negatively affecting single parents' workforce participation.  Corinthian focused on recruiting single parents

---

[4] Persis Yu, *Voices of Despair: Student Borrowers Trapped in Poverty When the Government Seizes Their Earned Income Tax Credit*, National Consumer Law Center, Mar. 2018 ("Voices of Despair"), http://bit.ly/2Gstfq2.

near the federal poverty line,[5] the sort of borrower most likely to receive refunds through the EITC.

13.     Such negative effects could also impact the families of these former students.  For instance, in Illinois as of 2015, 54% (654,070) of children in low-income families live with a single parent,[6] 52% (915,022) of children in low-income families in New York lived with a single parent as of 2015,[7] and 61% (250,992) of children in low-income families in Massachusetts lived with a single parent as of 2015.[8]  As such, the economic participation of single parents, including former Corinthian students, is vital not only to the local economies of the states but to the well-being of a majority of children in low-income families in each of the Plaintiff States.

14.     Moreover, each State also has standing because it is directly harmed when borrowers in the Designated Fraud Cohorts are prevented from attending public education institutions in its State, such as community colleges and public universities, because of the seizure of their assets prevents them from paying for their education. This deprives the States of these students' tuition dollars, injuring their proprietary interests.

---

[5] *See*, *e.g.*, Complaint at ¶ 3, *California v. Heald College et al.*, CGC-13-534793 (San Francisco County Superior Ct. Oct. 10, 2013), available at https://oag.ca.gov/system/files/attachments/press_releases/Complaint%2C%20filed%20stamped_0.pdf

[6] Illinois Demographics of Low-Income Children, National Center for Children in Poverty, available at http://www.nccp.org/profiles/IL_profile_6.html (last accessed April 10, 2018).

[7] New York Demographics of Low-Income Children, National Center for Children in Poverty, available at http://www.nccp.org/profiles/NY_profile_6.html (last accessed April 10, 2018).

[8] Massachusetts Demographics of Low-Income Children, National Center for Children in Poverty, available at http://www.nccp.org/profiles/MA_profile_6.html (last accessed April 10, 2018).

15.     In addition, the States pay out certain state benefits, such as food stamps, Medicaid funds, and/or housing assistance, to defrauded borrowers who would likely not require such assistance in the absence of administrative offset or wage garnishment.[9]  This further damages each State's proprietary interests.  Finally, defrauded borrowers that are subject to administrative offset or wage garnishment by the Department are less likely to contribute to each State's economy because they have fewer assets to spend or invest and face greater obstacles to securing financial stability.

### Plaintiff Commonwealth of Massachusetts

16.     The Commonwealth of Massachusetts, represented by Attorney General Maura Healey, is a sovereign state of the United States of America.

17.     Corinthian operated two campuses in Massachusetts: Everest Institute, Brighton; and Everest Institute, Chelsea.  Corinthian also enrolled Massachusetts residents in online programs offered through Corinthian schools located outside Massachusetts.

18.     Through its DTR Application, the Massachusetts AGO submitted borrower defense to repayment claims to the Department covering more than 7,000 Massachusetts borrowers, more than 2,300 of whom were in the Designated Fraud Cohorts.  The Massachusetts AGO also held 19 workshops and assisted 1,350 Everest MA borrowers in submitting individually-signed borrower defense to repayment applications to the Department.

---

[9] In the same way that the seizure of tax refunds harms the economic well-being of residents of the States, seizure of those refunds – including seizure of subsidies like the EITC –may increase welfare use. *See Voices of Despair*, supra note 4, at 2 ("In addition to encouraging employment, the EITC has led to a decline in welfare use.") (citing Jeffrey Grogger, *The Effects of Time Limits, the EITC, and Other Policy Changes on Welfare Use, Work and Income among Female-Head Families*, Review of Economics and Statistics 405, May 2003, at 400).

19.     The Department has brought involuntary collection actions against Everest MA borrowers, including Massachusetts borrowers who are members of the Designated Fraud Cohorts and covered by the Massachusetts DTR Application.

20.     Corinthian's fraudulent conduct, including misrepresenting job placement rate statistics, violated Massachusetts state law, including Massachusetts General Laws Chapter 93A, and thus provides a defense to repayment of borrowers' federal student loans.

**Plaintiff State of Illinois**

21.     The People of the State of Illinois are represented by Lisa Madigan, the Attorney General of the State of Illinois, which is a sovereign state of the United States of America.

22.     Corinthian operated seven campuses in Illinois: Everest College, Bedford Park; Everest College, Burr Ridge; Everest College, Chicago; Everest College, Melrose Park; Everest College, Merrionette Park; Everest College, North Aurora; and Everest College, Skokie.  All Illinois campuses were taught out by August 2015.  Corinthian also enrolled thousands of Illinois residents in both online programs offered through Corinthian schools located outside of Illinois, and in brick and mortar campuses located in other states.

23.     Through its DTR Application, the Illinois AGO requested that the Department discharge all loans of Corinthian IL borrowers within the Designated Fraud Cohorts.  Over 6,000 Illinoisans are members of the Designated Fraud Cohorts.  The Illinois AGO also conducted outreach to Illinois borrowers who are members of the Designated Fraud Cohorts concerning the borrower defense to repayment loan discharge application process.

24.     The Department has brought involuntary collection actions against Corinthian IL borrowers, including Illinois borrowers who are members of the Designated Fraud Cohorts and covered by the Illinois DTR Application.

25.     Corinthian's fraudulent conduct, including misrepresenting job placement rate statistics, violated Illinois state laws, including the Illinois Consumer Fraud Act 815 ILCS 505/1 *et seq.*, and thus provides a defense to repayment of borrowers' federal student loans.

## Plaintiff State of New York

26.     The State of New York, represented by Attorney General Eric T. Schneiderman, is a sovereign state of the United States of America.

27.     Corinthian operated a campus in Rochester, New York, until April 27, 2015 and also enrolled thousands of New Yorkers in online and in-person programs offered through Corinthian schools located outside of New York.

28.     At least 3,290 New Yorkers are members of the Designated Fraud Cohorts.  The New York AGO conducted outreach to New York borrowers who are members of the Designated Fraud Cohorts concerning the borrower defense to repayment loan discharge application process.

29.     The Department has brought involuntary collection actions against New York Corinthian borrowers, including New York borrowers who are members of the Designated Fraud Cohorts.

30.     Corinthian's fraudulent conduct, including misrepresenting job placement rate statistics, violated New York state laws, including New York General Business Law §§ 349 and 350 and New York Executive Law § 63(12), and thus provides a defense to repayment of borrowers' federal student loans.

**Defendants**

31.     Defendant United States Department of Education is an executive agency of the

United States government.  The Department's principal address is 400 Maryland Avenue, SW,

Washington, D.C. 20202.

32.     Defendant Elisabeth DeVos is the Secretary of the United States Department of

Education.  Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

## JURISDICTION AND VENUE

33.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this

action arises under the APA, 5 U.S.C. §§ 702 & 706, and the Higher Education Act, 20 U.S.C. §

1082.  In addition, the Court has jurisdiction to compel an officer or employee of the

Department, including the Secretary, to perform his or her duty under 28 U.S.C. § 1361.

34.     This is an action against an officer and agency of the United States.  Therefore,

venue is proper in this Court under 28 U.S.C. § 1391(e).  Additionally, venue is proper in this

Court because the Department resides in this judicial district and Secretary DeVos performs her

official duties in this judicial district, and many of the events giving rise to this action took place

in this judicial district.

35.     This Court is authorized to award the requested declaratory and injunctive relief,

including monetary relief, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the

APA, 5 U.S.C. § 706, the Mandamus Act, 28 U.S.C. § 1361, and the Higher Education Act, 20

U.S.C. § 1082.

## FACTUAL ALLEGATIONS

A.     **Regulatory Framework**

36.     The Department oversees and is responsible for the federal student loan programs

under Title IV of the Higher Education Act, 20 U.S.C. § 1071, *et seq.*  The federal student loan

programs are central components of the financial aid provided to students under Title IV.  These programs are designed to provide critical assistance to students and to expand access to higher education for students who could not otherwise afford to pursue a degree or certificate.

37.     Federal student loan debts are not dischargeable in bankruptcy except where repaying the loan would cause undue hardship.  *See* 11 U.S.C. § 523(a)(8).

38.     The Department possesses extensive authority to collect defaulted student loans, including the power to seize federal tax refunds and certain government benefits and administratively garnish wages through the Debt Collection Improvement Act, 31 U.S.C. § 3701, *et seq*. (the "Debt Collection Act").  *See* 31 U.S.C. §§ 3711, 3716, 3720A, & 3720D.

39.     Although the Department has widespread authority to collect defaulted student loan debt, this power is limited in certain critical ways.

40.     To seize federal tax refunds and certain government benefits, the Department can submit debts to the Department of Treasury's Fiscal Service through TOP, which is governed by the Debt Collection Act and its implementing regulations promulgated by the Departments of Education and Treasury.  But when submitting any debt for involuntary collection through TOP, the Department must certify that the debt is "legally enforceable."  *See* 31 U.S.C. §§ 3716(c)(6)(A) & 3720A; 31 C.F.R. § 285.5.

41.     The Department of Treasury defines "legally enforceable" in regulations implementing TOP as follows:

> Legally enforceable refers to a characteristic of a debt and means there has been a final agency determination that the debt, in the amount stated, is due, and there are no legal bars to collection by offset.  Debts that are not legally enforceable for purposes of this section include, but are not limited to, debts subject to the automatic stay in bankruptcy proceedings or debts covered by a statute that prohibits collection of such debt by offset.  For example, if a delinquent debt is the subject of a pending administrative review process required by statute or regulation, and if collection action during the review process is prohibited, the

> debt is not considered legally enforceable for purposes of this section. Nothing in this section is intended to define whether a debt is legally enforceable for purposes other than offset under this section.

31 C.F.R. § 285.5(b).

42.     In guidance the Department provided a vendor in November 2015, it noted that debts that are considered unenforceable, without merit, unsubstantiated, or suspended must be excluded from selection for certification for purposes of TOP. The Department also noted that any debt currently being evaluated under, or already deemed eligible for, the various discharge processes must be excluded from selection. The Department provided similar guidance in November 2016 relating to the recertification of debts for purposes of TOP.

43.     Once the Department has notified a debtor of its intent to offset a debt, the Secretary may offset future years' tax refunds without providing the debtor with additional pre-deprivation notice. 34 C.F.R. §§ 30.22(d) & 30.33(a). But to effectuate future offsets, the Department must re-certify the debt to the Fiscal Service each year. This certification must be in writing and include certification that the debt continues to be legally enforceable. 31 C.F.R. § 285.5(d)(3)(i)(B) & (d)(7)(i).

44.     The Department has an ongoing obligation to immediately notify the Fiscal Service of any change in status of the legal enforceability of the debt. 31 C.F.R. §§ 285.2(d)(4) & 285.5(d)(10)(iv).

45.     The Department may also issue wage garnishment orders. The Department's administrative wage garnishment authority is governed by 31 U.S.C. § 3720D of the Debt Collection Act and 34 C.F.R. § 34.1, *et seq.* The Department can garnish wages to collect on a delinquent debt or claim.

46.     For purposes of administrative wage garnishment, debt or claim "means any amount of money, funds, or property that an appropriate official of the Department has

determined an individual owes to the United States under a program we administer." 34 C.F.R. § 34.3.

47.     The Department may initiate a wage garnishment only if there is a legally enforceable debt that is owed to the United States under a program it administers. It implicitly acknowledges this requirement by providing student borrowers the opportunity for an initial hearing concerning the enforceability of the debt. *See* 34 C.F.R. §§ 34.6 & 34.8.

48.     Student loan borrowers may assert to the Department as a defense to repayment any act or omission by the school the student attended that would give rise to a cause of action against the school under state law. 34 C.F.R. § 685.206(c)(1); *see also* 20 U.S.C. § 1087e(h). If the borrower's defense against repayment is successful, the Department must notify "the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay." 34 C.F.R. § 685.206(c)(2).

49.     The student loan promissory note also provides borrowers the right to assert defenses to repayment based on a school's violation of state law. The following language is included in such notes:

> In some cases, you may assert, under applicable law and regulations, a defense against repayment of your loan on the basis that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for. If you believe that you have a defense against repayment of your loan, contact your servicer.

50.     The Department has instituted a process where students can submit individually-signed borrower defense to repayment claims on a form that the Department created, regardless of whether they are currently facing involuntary collection.

**B.      Widespread Evidence of Corinthian Fraud**

51.      The Department is well aware of acts and omissions by Corinthian that provide its former students a cause of action against the school under state law, and thus defenses to repayment.

**1.   The Department Conducted Its Own Investigation and Issued Findings**

52.      The Department's investigation into Corinthian's falsification of its placement rates began in the winter of 2013.  In January 2014, the Department asked Corinthian for data regarding its advertised placement rates.

53.      Following a back and forth during which the Department pressed Corinthian for placement rate data and Corinthian refused to provide that data, the Department placed Corinthian on heightened cash monitoring status in June 2014.

54.      The increased scrutiny on federal student aid payments exacerbated Corinthian's existing financial instability and the school nearly collapsed.  The Department was forced to step in and provide Corinthian with an immediate cash infusion through a June 2014 memorandum of understanding. Corinthian agreed to turn over the placement information requested by the Department, to sell many of its campuses within six months, and to teach-out and close others.

55.      In April 2015, the Department concluded part of its investigation into Corinthian's falsification of placement rates and issued a fine letter against Corinthian.  That fine letter concluded that Corinthian misled students about its programs by inflating placement rates at its Heald College locations.  Corinthian did so by, among other means, counting students as placed based on jobs they held before enrolling at Corinthian, creating temporary unsustainable jobs for students and counting those students as placed, and counting students as placed when their jobs were unrelated to the education they received at Corinthian.  The Department notified

Corinthian that it intended to fine Heald $30 million for those violations, and also ordered that Corinthian stop enrollments at those locations.

56.     On April 27, 2015, shortly after the Department notified Corinthian of its intention to impose a fine based on the falsified placement rates, Corinthian announced the closure of all its remaining schools, filed for bankruptcy in May 2015, and began the process of dissolution.

57.     The Department subsequently found that Corinthian defrauded its students in the Designated Fraud Cohorts.  Starting on June 8, 2015, the Department began announcing findings of fraud at Corinthian stemming from the misrepresentations of job placement rates.  The announcement covered hundreds of cohorts where the Department found fraud at Corinthian's Heald schools.

58.     On June 25, 2015, the Department announced the appointment of a special master, Joseph A. Smith, Jr., to advise the Department about borrower defense issues.  This appointment was in large part because of Corinthian's collapse, which resulted in the submission of large numbers of borrower defense to repayment claims.

59.     On November 17, 2015, the Department announced more findings that Corinthian had defrauded its students. The November announcement covered misrepresentations of job placement rates at Everest and WyoTech campuses in California and Florida and included many online programs that enrolled students nationwide, including students from Massachusetts, Illinois, and New York.

60.     On December 3, 2015, the Special Master for Borrower Defense specifically encouraged state attorneys general to submit evidence of fraud to the Department so that it could use that information to make findings related to borrower defense to repayment: "We continue to

invite all state attorneys general to provide evidence of institutions' wrongdoing to me and the Department so that I can make determinations about the implications of the evidence on potential borrower defense claims."[10]

61.     On March 25, 2016, the Department announced still more findings that Corinthian had defrauded its students.  Then Secretary of Education John B. King, Jr. stated the following:

> Corinthian was more worried about profits than about students' lives.  Through these important partnerships with states' attorneys general, we are pleased to offer relief to Corinthian students who were defrauded.  And we will continue to take action to protect students and taxpayers from unscrupulous companies trying to profit off of students who simply want to better their lives.[11]

62.     Secretary King noted that the Massachusetts AGO "was instrumental in bringing forward evidence that Corinthian's two Everest Institute campuses in Massachusetts – Chelsea and Brighton – misrepresented their job placement rates to enrolled and prospective students." The Secretary also noted his gratitude for cooperation from other state attorneys general, including Illinois.

63.     Beginning in April 2016, the Department requested that states conduct outreach to their residents in the Designated Fraud Cohorts.  Beginning in July 2016, the Department sent forty-seven state attorneys general, including those of Illinois, Massachusetts, and New York, information on all residents of their respective states who enrolled in a Corinthian school from 2010 to 2014.  The information included program, campus, credential level, and date of first

---

[10] *Second Report of the Special Master for Borrower Defense to the Under Secretary, United States Department of Education*, Dec. 3, 2015, http://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-2.pdf.

[11] *Department of Education Press Release*, Mar. 25, 2016, https://www.ed.gov/news/press-releases/us-department-education-announces-path-debt-relief-students-91-additional-corinthian-campuses.

enrollment, the four factors necessary to determine if a borrower is in a cohort where the Department found fraud.

64.     Forty-seven attorneys general, including those of Illinois, Massachusetts, and New York, pooled resources through the National Association of Attorneys General and retained a settlement administrator at significant cost to coordinate contacting all borrowers in the cohorts where the Department found fraud nationwide.

65.     Building on the eligibility and verification work of the forty-seven attorneys general (including those of each of the States), the settlement administrator created a set of rules to sort eligible from ineligible students in the data that the Department sent to the participating states. These rules were tested and refined in conjunction with the state attorneys general throughout the first quarter of 2017.

66.     Although the Department and the States have conducted outreach efforts to borrowers in the Designated Fraud Cohorts, many borrowers in the Designated Fraud Cohort have not received notification and remain unaware that the Department made findings of fraud about their program and that they can apply for a loan discharge or assert a defense repayment based on the Department's findings. As recently as January 2017, the Department announced that it was pursuing new methods to reach borrowers in the cohorts it found were subject to fraud, including through expanded mailings and Facebook advertisements.

### 2.  Attorneys General Investigated and Litigated Against Corinthian, Securing Judgments

67.     Attorneys general also independently conducted investigations of Corinthian, shared evidence with the Department, and litigated against Corinthian.

68.     For example, on April 3, 2014, Massachusetts filed suit in Massachusetts Superior Court against Corinthian for violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 2.

69.     While litigation was pending, the Massachusetts AGO brought the issue of Corinthian's illegal acts, which provide defenses to loan repayment, to the attention of the Department.  The Massachusetts AGO submitted its DTR Application to the Department, together with more than 2,700 pages of evidence, together with a list identifying the 7,241 students on whose behalf the DTR application was submitted, on November 30, 2015.  This evidence was obtained over the course of a thorough investigation.

70.     During its review, the Massachusetts AGO obtained records from Corinthian, its accreditor, its successor, lenders, and other parties; reviewed over 650 survey responses from former students; conducted over 900 employment verifications; and interviewed more than 100 former Corinthian employees and students.

71.     A key component of the evidence in the Massachusetts DTR Application involved audits of the in-field job placement rates that Corinthian published for its Massachusetts campuses.  The Massachusetts AGO audited these claimed placement rates for certain cohorts by verifying the underlying individual job placements with the alleged employers, and in certain cases, the students.  Through this process, the Massachusetts AGO determined that Corinthian had inflated its in-field job placement rates by falsifying jobs, counting jobs regardless of field, and counting temporary positions or unsustainable employment.

72.     Compounding this deception, student reports indicate that Corinthian's sales representatives routinely cited in-field job placement rates that exceeded the falsified written rates.

73.     The Massachusetts DTR Application also provided significant evidence regarding high-pressure sales tactics.  The evidence submitted with the Massachusetts DTR Application shows that Corinthian often rushed and pressured students into uninformed and ill-advised enrollment decisions.

74.     Additionally, the Massachusetts DTR Application included evidence that students did not receive the education Corinthian promised.  Corinthian's sales representatives promised students a high-quality, hands-on educational experience with professional instructors and small classes; placement in relevant externships; and assistance with job placement, resume writing, and interviewing.

75.     But once students had signed enrollment contracts and promissory notes, Corinthian failed to provide the promised education or career services upon which the students were relying.  Many students reported a dangerous, inadequate, and inappropriate learning environment.  There were consistent student reports of cheating, on-campus violence, and drug use, as well as apathetic teachers and unresponsive administrators.

76.     In total, the Massachusetts DTR Application requested student loan discharges for all Everest MA students who enrolled between 2007 and 2014.  The Massachusetts AGO sought this relief because of the following violations of state law, all carefully documented by student affidavits, survey responses, and other evidence:

    a.     Corinthian misled and deceived students about in-field job placement rates;

    b.     Corinthian misrepresented the availability of career services;

    c.     Corinthian engaged in high pressure sales tactics;

    d.     Corinthian misrepresented the quality and type of education and instruction;

    e.     Corinthian misrepresented the qualifications of instructors;

f.      Corinthian misrepresented the learning environment and failed to provide a safe learning environment;

g.      Corinthian misrepresented the salaries of graduates;

h.      Corinthian misrepresented the transferability of credits;

i.      Corinthian misrepresented student externships; and

j.      Corinthian misled students about their ability to benefit from its programs.

77.     After the Massachusetts AGO submitted its DTR Application to the Department, Massachusetts continued litigating against Corinthian in Massachusetts Superior Court, filing for summary judgment (unopposed).  On June 6, 2016, the court found Corinthian liable for violating the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 1, *et seq*.  After a hearing on damages, the court ordered Corinthian to pay restitution representing refunds of all costs paid by all graduates of the Everest MA's Dental Assistant, Medical Assistant, Medical Administrative Assistant, Medical Insurance Billing and Coding, and Massage Therapy programs who enrolled between July 1, 2007 and June 30, 2014.  These programs comprise all programs offered by Corinthian at Everest MA during this period.

78.     Corinthian, insolvent and in bankruptcy, did not pay and was incapable of paying the judgment that Massachusetts secured.  But this judgment demonstrates that Corinthian violated Massachusetts law.  The Department was aware of the judgment due to various conversations with Massachusetts AGO staff, and in any event, was again formally notified and provided a copy of the judgment on May 10, 2017.

79.     In December 2016, the Department asked the Massachusetts AGO for a list of the Everest MA students who were in the Designated Fraud Cohorts.  The Massachusetts AGO provided this dataset to the Department on December 7, 2016, and had previously provided it to the Department on April 8, 2016.  The dataset was a subset of data that Corinthian provided to

20

the Massachusetts AGO during its investigation.  The Massachusetts AGO verified the accuracy

of the dataset, including the listed enrollment dates and program names, with over 1,200 Everest

MA students when it assisted those students in submitting individually-signed borrower defense

to repayment applications.

80.     On December 13, 2017, Massachusetts AGO staff members spoke to senior

representatives of the Department to explain why the dataset was sufficient to identify

Massachusetts students in the Designated Fraud Cohorts.  The Department's representatives

appeared to agree that the dataset was sufficient to identify Massachusetts students in the

Designated Fraud Cohorts.

81.     Two other attorneys general also investigated and litigated against Corinthian.

The California Attorney General brought an action against Corinthian relating to its campuses in

that state and secured a judgment against Corinthian.  In addition, the Wisconsin Attorney

General filed a lawsuit against Corinthian for violations of Wisconsin law related to

misrepresented job placement rates.

### 3.  Illinois Investigated Corinthian, Shared Findings with the Department, and Identified the Borrowers in the Designated Fraud Cohorts

82.     In Illinois, Corinthian operated seven campuses as well as online education

programs.  Corinthian did business in Illinois under the names Everest College and Olympia

College.

83.     In 2011, the Illinois AGO began investigating Corinthian for deceptive practices,

ultimately collecting more than 100,000 documents over the course of the investigation.

84.     In the course of marketing and selling their programs to Illinois consumers,

Corinthian engaged in a variety of unlawful, deceptive, unfair and abusive conduct, including

misrepresentations and omissions related to job placement rates.

85.     For example, the Illinois AGO found in the course of its investigation that Corinthian misrepresented its in-field job placement rate to prospective students by attaching outdated job placement data to its applications, counting students as placed when they were unemployed or only had temporary positions, counting students who were employed prior to entering Corinthian's programs as placed, counting placements regardless of field, counting students as placed in fields that required state licensure when the students did not pass the licensing exam, and making oral misrepresentations regarding placement rates.

86.     Most students who attended Corinthian did so in order to improve their job prospects and were damaged by misrepresentations about their ability to find work after graduation.  Indeed, many students are left saddled with debt they cannot pay off because they cannot find employment following graduation, or cannot find employment with sufficient income to repay the student loans used to attend Corinthian.  Some students are even disqualified from certain positions due to their debt and resulting poor credit.

87.     Starting in June 2015, the Illinois AGO began sharing information and findings from its investigation with the Department.

88.     The Department ultimately found that Corinthian defrauded students in twenty-nine programs across six Everest College campuses in Illinois between 2010 and 2014.

89.     As described in paragraph 63, in July 2016, the Department sent the Illinois AGO information on all Illinois residents who enrolled in a Corinthian school from 2010 to 2014.  The information included program, campus, credential level, and date of first enrollment, the four factors necessary to determine if a student was in a cohort where the Department found fraud.

90.     Thereafter, the Illinois AGO engaged in a wide-ranging effort to identify eligible students and to verify that the Department's data was accurate.

91.     The Illinois AGO compared the cohort data offered by the Department with enrollment data and course catalogs obtained over the course of the Illinois AGO's investigation into Corinthian.

92.     In addition, the Illinois AGO made calls and sent emails to students to verify that the students that were eligible based on the Department's data were in applicable cohorts.

93.     As part of this verification, the Illinois AGO identified over 3,000 students the Department's data indicated were in the Designated Fraud Cohorts who attended brick-and-mortar Corinthian schools located in Illinois.

94.     Over the course of just two weeks in December 2016, the Illinois AGO was able to verify that over 900 of that group of more than 3,000 individuals were in the cohorts indicated in the Department's data.

95.     On December 16, 2016, after making these determinations, the Illinois AGO sent a letter to the Department informing it of the Illinois AGO's verification process and the reliability of the Department's data.  The letter requested discharge of all loans where the Department's data indicated that the student attended a cohort with a finding of fraud, and included a list of the eligible students.  The Illinois AGO indicated the independently verified students within that list.

96.     In its DTR application, the Illinois AGO included sworn affidavits attesting to the process and verification of these individual students.  In addition, the Illinois AGO used course catalogs obtained in its investigation to confirm that the credentials listed in the Department's data (diploma, associate's degree, bachelor's degree, etc.) matched the credentials listed in the Department's findings of fraud.  The Illinois AGO included a memo on this analysis in the Illinois DTR Application.

97.  On January 4, 2017, the Illinois AGO sent a letter to the Department identifying over 200 additional students it was able to confirm attended the brick-and-mortar Illinois campuses and programs for which the Department found fraud.

98.  In total, the Illinois AGO *verified* over 1,000 students identified by the Department as being in the fraudulent cohorts and as having attended brick-and-mortar Corinthian institutions in Illinois.

99.  The Department has not responded to the Illinois AGO's December 16, 2016 discharge application.

100.  While the Illinois AGO's request for group discharge was pending, the Illinois AGO contacted all Illinois residents in the Designated Fraud Cohorts and urged them to fill out a borrower defense attestation form.

101.  As noted in paragraphs 64 and 65, the Illinois Attorney General and other attorneys general pooled resources through the National Association of Attorneys General and retained a settlement administrator at significant cost to coordinate contacting all borrowers in the cohorts where the Department found fraud nationwide.  The settlement administrator created a set of rules to sort eligible from ineligible students in the data that the Department sent to the participating states.  These rules were tested and refined in conjunction with the state attorneys general throughout the first quarter of 2017.

102.  In April 2017, the Illinois AGO mailed over 5,800 Illinois residents in the Designated Fraud Cohorts and urged them to fill out attestation forms.

103.  In September 2017, the Illinois AGO mailed over 300 more Illinois residents in the Designated Fraud Cohorts and urged them to fill out attestation forms.

104.   The Illinois AGO expended significant resources to identify and verify the eligible borrowers in Illinois and to inform those borrowers about the borrower defense provided by the Department.  These resources included extensive employee time, the cost of the settlement administrator, IT expenses, mailing expenses, and telephone expenses.

105.   As of July 7, 2017, the Department had 3,049 pending individually-signed borrower defense applications from Illinois residents who attended Corinthian.

### 4. The Consumer Financial Protection Bureau Also Sued Corinthian and Secured a Judgment

106.   Law enforcement efforts against Corinthian were not limited to state agencies.  At the federal level, the Consumer Financial Protection Bureau (the "CFPB") also sued Corinthian in federal district court.

107.   In 2014, the CFPB filed a lawsuit against Corinthian alleging that for years the school had induced prospective students to enroll through false and misleading representations about its graduates' career opportunities and likelihood of obtaining jobs upon graduation by using inflated job placement statistics.  The CFPB ultimately obtained a judgment against Corinthian in this litigation.

108.   The Department is aware of the judgment against Corinthian entered in the CFPB litigation.

## C.    The Department Unlawfully Continues Involuntary Collections

109.   Even though the Department found that Corinthian defrauded students, identified those students, and is also aware of the various investigations and lawsuits against Corinthian, the judgments secured by state attorneys general and the CFPB, and the evidence submitted in the Massachusetts and Illinois DTR Applications, it has continued to 1) submit the Corinthian-related debts of borrowers, including borrowers in the Designated Fraud Cohorts, to the Fiscal

Service for administrative offset, together with certifications that such debts were legally enforceable, and 2) issue wage garnishment orders to satisfy these debts.  It seized tax refunds and government benefits and administratively garnished wages.

110.    As of late 2016, more than 30,000 Corinthian borrowers nationwide were subject to administrative offset.  More than 4,000 more were subject to wage garnishment.

111.    On June 5, 2017, eighteen state attorneys general, including those of each of the States, the District of Columbia Attorney General, and the Executive Director of the Office of Consumer Protection of Hawaii sent a letter to the Department urging "the Department to stop certifying these borrowers' debts as enforceable for purposes of the Treasury Offset Program or otherwise engage in involuntary collection against these borrowers while continuing to process these students' attestations as rapidly as practicable."

112.    On July 14, 2017, the Department responded to the June 5, 2017 letter from the state attorneys general.  The response did not address the request of the state attorneys general that involuntary collections for these students cease.

113.    Students may submit individual borrower defense to repayment claims to attempt to avoid involuntary collection, but many borrowers subject to Corinthian's unfair practices have not done so.

114.    Many borrowers in the Designated Fraud Cohorts are not aware that they that they are eligible to apply for a loan discharge.

115.    Even if students submit individual borrower defense to repayment claims, they may still be subject to continuing involuntary collections.  The *Washington Post* has reported

that a number of applicants say that their forbearances were not renewed after one year.[12]  It went on to report that Department spokeswoman Liz Hill said that Federal Student Aid, an Office of the Department, was aware of the problem.  These borrowers may face, as Borrower 7 has faced, see paragraph 116, subparagraph g, below, involuntary collection or wage garnishment while they wait for the Department to process their borrower defense to repayment claims.

116.   The following examples illustrate involuntary collection activity instituted by the Department against borrowers in the Designated Fraud Cohorts who have not submitted individually-signed defenses to repayment, or who submitted the individually-signed defense to repayment after involuntary collection had already occurred:[13]

a.     Borrower 1, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $3,826 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around August 18, 2017.

b.     Borrower 2, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of his entire $472 federal tax refund for the year 2016.  He submitted an individually-signed borrower defense to repayment claim on or around April 3, 2017.

c.     Borrower 3, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $512 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around May 3, 2017.

d.     Borrower 4, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $1,900 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around April 14, 2017.

---

[12] Danielle Douglas-Gabriel, *Education Dept.'s mishandling of student debt relief claims creating headaches for applicants,* WASHINGTON POST, Mar. 7, 2018, https://www.washingtonpost.com/news/grade-point/wp/2018/03/07/education-dept-s-mishandling-of-student-debt-relief-claims-creating-headaches-for-applicants/

[13] Plaintiffs will file a motion for leave to file a reference list under seal identifying these borrowers. The borrowers in this list are examples and do not constitute the complete universe of borrowers who were subjected to involuntary collections.

e.      Borrower 5, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $1,275 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around September 14, 2017.

f.      Borrower 6, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $1,041 federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around September 5, 2017.

g.      Borrower 7 is the father of a student within the Designated Fraud Cohorts. He took a Parent PLUS loan to help pay for his daughter's education at Everest MA.  He was subjected to involuntary collection, including the offset of $166.50 of his $1,100 monthly social security check in July 2017, September 2017, November 2017, and January 2018.  He submitted an individually-signed borrower defense to repayment claim on or around July 12, 2017 that included a request that his loans be put into forbearance (nevertheless, the Department has continued seizing his social security checks). His daughter submitted an individually-signed borrower defense to repayment claim on or around May 11, 2016.  Thus, even prior to Borrower 7's submission, the Department was aware that the student to which his loans related had alleged that Corinthian had violated state law.

h.      Borrower 8, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of $4,478 from her federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim on or around September 14, 2017.

i.      Borrower 9, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of $4,635 from her federal tax refund for the year 2015 (taken on April 20, 2016).  She submitted an individually-signed borrower defense to repayment claim on or around September 25, 2017.

j.      Borrower 10, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $3,491 federal tax refund for the year 2016.  She has not yet submitted an individually-signed borrower defense to repayment claim.

k.      Borrower 11, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire $10,216 federal tax refund for the year 2016.  While her husband was able to dispute a portion of the refund offset via an Injured Spouse Allocation, she did not receive the entire refund back.  She submitted an individually-signed borrower defense to repayment claim on or around July 19, 2017. Borrower 11 had a job offer revoked due to her excessive debt.  She also has received benefits through the Supplemental Nutrition Assistance

Program ("SNAP") and Medicaid.  She would attend a community college in Illinois (her state of residence) if she did not have debt, but she cannot get further loans because her Corinthian loans are currently in default.

l.      Borrower 12, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her entire approximately $7,000 federal tax refund for the year 2016 as well as having her wages garnished.  She submitted an individual-signed borrower defense to repayment claim on or around April 26, 2017.  Borrower 12 receives SNAP benefits and Medicaid.

m.     Borrower 13, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including administrative wage garnishment in effect through September 12, 2016.  She submitted an individually-signed borrower defense to repayment claim on or around November 8, 2016.

n.      Borrower 14, a student within the Designated Fraud Cohorts, was subjected to involuntary collection, including the offset of her federal tax refund for the year 2016.  She submitted an individually-signed borrower defense to repayment claim in or around May of 2017.

117.    In each example listed above, the Department knew that these individuals were in programs subject to misleading job placement statistics, as well as other violations of state law. Nevertheless, the Defendants submitted these debts to Fiscal Service for administrative offset, together with certifications that the debts were legally enforceable, in order to seize the borrowers' tax refunds or government benefits, and/or the Defendants issued wage garnishment orders and made determinations that their debts were owed in order to administratively garnish the borrowers' wages.

## CAUSE OF ACTION

### Unlawful Collection Activity – Violation of the APA § 706 (2)

118.    The States repeat and re-allege paragraphs 1 through 117 of the Complaint.

119.    The Defendants violated the APA, 5 U.S.C. § 706, by taking improper final agency actions relating to student loan debts of Everest MA, Corinthian IL, and Corinthian NY borrowers in the Designated Fraud Cohorts, including (1) unlawfully submitting these debts to

Fiscal Service for administrative offset, together with certifications that such debts were legally enforceable, and (2) unlawfully issuing wage garnishment orders to satisfy these debts.

120.    Through their own findings of fraud with respect to the Designated Fraud Cohorts, possession of information identifying the borrowers in the Designated Fraud Cohorts, and possession of other strong evidence of wrongdoing at Everest and other Corinthian locations, the Defendants knew or should have known that the student loan debts of Everest MA, Corinthian IL, and Corinthian NY borrowers in the Designated Fraud Cohorts were not legally enforceable or owed.

121.    Therefore, the Defendants' final agency actions described in paragraph 119 were arbitrary and capricious and without observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 706(2)(A) & (D).

## PRAYER FOR RELIEF

WHEREFORE, the States respectfully request that this Court enter judgment and order for relief as follows:

A.    Declare that federal student loan debts incurred by or on behalf of Everest MA, Corinthian IL, and Corinthian NY students in the Designated Fraud Cohorts are not legally enforceable for purposes of administrative offset or owed for purposes of wage garnishment;

B.    Declare that Everest MA, Corinthian IL, and Corinthian NY students in the Designated Fraud Cohorts have valid defenses to repayment for the purpose of any involuntary collection action taken by the Defendants with respect to the related student loan debts;

C.    Strike the Defendants' submissions to Fiscal Service of federal student loan debts incurred by or on behalf of Everest MA, Corinthian IL, and Corinthian NY students in the Designated Fraud Cohorts as arbitrary and capricious or without observance of procedure required by law, in violation of the APA;

D.    Strike the Defendants' issuance of wage garnishment orders to satisfy federal student loan debts incurred by or on behalf of Everest MA, Corinthian IL, and Corinthian NY students in the Designated Fraud Cohorts as arbitrary and

capricious or without observance of procedure required by law, in violation of the APA;

E.  Order ancillary relief under 28 U.S.C. § 2202, including refunding amounts already seized from such Everest MA, Corinthian IL, and Corinthian NY borrowers pursuant to the unlawful administrative offset or wage garnishment; and

F.  Grant such other and further relief as the Court may deem just and proper.

Dated: April 12, 2018

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS
MAURA HEALEY
MASSACHUSETTS ATTORNEY GENERAL

By:  */s/ Timothy Hoitink*
Glenn Kaplan
Timothy Hoitink
Jennifer Snow
Assistant Attorneys General
Insurance and Financial Services Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2453 (Kaplan)
(617) 963-2465 (Hoitink)
(617) 963-2516 (Snow)
Glenn.Kaplan@state.ma.us
Timothy.Hoitink@state.ma.us
Jennifer.Snow@state.ma.us


THE PEOPLE OF THE STATE OF ILLINOIS
LISA MADIGAN
ILLINOIS ATTORNEY GENERAL

By:  */s/ Joseph Sanders*
Joseph Sanders
Gregory W. Jones
Assistant Attorneys General
Consumer Fraud Bureau
100 West Randolph Street, 12th floor
Chicago, Illinois 60601

312-814-6796 (Sanders)
312-814-4987 (Jones)
Fax: 312-814-2593
jsanders@atg.state.il.us
gjones@atg.state.il.us


STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
NEW YORK ATTORNEY GENERAL

By: */s/ Jane M. Azia*
Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
Carolyn Fast
Assistant Attorney General
120 Broadway, 3rd floor
New York, NY 10271
(212) 416-8727 (Azia)
(212) 416-6250 (Fast)
Jane.Azia@ag.ny.gov
Carolyn.Fast@ag.ny.gov